2020 IL App (1st) 171329-U

No. 1-17-1329

Order filed June 11, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 14 CR 8407 |
| | ) | |
| AYOTUNDE ADEKALE, | ) | Honorable |
| | ) | Michele McDowell Pitman, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for aggravated discharge of a firearm where he failed to show that his trial counsel was ineffective and the State did not make any improper remarks during rebuttal closing argument. Additionally, defendant's four-year sentence for the offense was not excessive.

¶ 2    Following a jury trial, defendant Ayotunde Adekale was found guilty of aggravated discharge of a firearm and, though eligible for probation, the trial court sentenced him to four years' imprisonment, the minimum sentence for the offense. On appeal, defendant contends that:

(1) his trial counsel provided ineffective assistance where counsel failed to exercise a peremptory challenge on, or move to strike for cause, a juror who worked with and personally knew multiple police officers involved in the case; (2) his trial counsel provided ineffective assistance where counsel failed to request a jury instruction on the justified use of force by a private person in making a citizen's arrest; (3) he was deprived of a fair trial where, during rebuttal closing argument, the State improperly provided the jury with a definition of reasonable doubt that minimized its burden of proof; and (4) his four-year sentence was excessive. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      A grand jury indicted defendant with two counts of aggravated discharge of a firearm. One count alleged that defendant knowingly discharged a firearm in the direction of OJ Yarbor. The other count alleged that defendant knowingly discharged a firearm in the direction of a vehicle he knew or should have known to be occupied by Yarbor. Defendant's case proceeded to a jury trial.

¶ 5                                    A. Jury Selection

¶ 6      At the beginning of jury selection, the trial court read the prospective jurors a list of the possible witnesses in the case, which included several officers from the Cook County Sheriff's Office. The court informed the prospective jurors of additional information and then asked if any of them knew any of the people involved in the case. One prospective juror, Thomas Fleming, stated that he knew "[a]ll" of the Cook County Sheriff's officers, explaining that he was a chief and the director of training and education in the Cook County Sheriff's Office. After the court asked Fleming how well he knew the officers, Fleming responded that he knew multiple of them on a personal level. The court asked Fleming if his relationship with the officers would "affect [his] ability to be fair and impartial," and Fleming responded that it would not. The court also

asked if he knew anything specific about the case, and Fleming responded that he did not and had never talked to the officers about defendant's case. The court again asked Fleming if his relationship with the officers would affect his ability to be fair and impartial, and Fleming confirmed that it would not.

¶ 7 Later, during the trial court's *voir dire* of Fleming, he stated that he had worked in the Cook County Sheriff's Office for five years. The court asked him if he would be able to assess the credibility of a police officer in the same manner as he would assess the credibility of an ordinary citizen, and Fleming stated he would. Fleming further told the court that he would follow the law and return verdicts consistent with the law. Neither the State nor defense counsel asked to personally question Fleming, and both sides accepted him as a juror.

¶ 8                                         B. Trial

¶ 9                                    1. The State's Case

¶ 10 At trial, the State's evidence showed that, in the spring of 2014, Willie Mae Strickland and defendant were married, but, according to Strickland, they had been separated for about five years. Strickland was living in a house in Ford Heights, Illinois, with her son, and they had been living there since October 2013. According to Strickland, defendant had never lived with her at that residence. During the spring of 2014, however, she and defendant were trying to reconcile their relationship. Sometime in March 2014, she and defendant traveled to Reno, Nevada, together. On April 2, 2014, she and defendant took photographs together and went to a movie. Strickland acknowledged that, in the photographs which were introduced into evidence, she was kissing defendant and holding up a diamond ring he had given her. Strickland testified that, around this time, she and defendant saw each other "maybe once or twice" a week, but ultimately, they could not resolve their differences. At trial, Strickland acknowledged still being married to defendant.

¶ 11 In the evening of April 26, 2014, Strickland was home alone when OJ Yarbor came over. Strickland had met Yarbor through a mutual friend, who initially introduced them because Yarbor owned a tax preparation business, and he helped Strickland file her income taxes. According to Yarbor, after helping Strickland prepare her taxes, they began to have a personal relationship. Though Strickland testified that she told Yarbor she was married, Yarbor testified that he believed she was single because when he prepared her taxes, she did not file a joint return. After Yarbor came over to Strickland's house, he developed a headache, so they stayed in and he eventually fell asleep. Around midnight, Strickland heard a knock on her front window and left her bedroom to see who was knocking. There, she observed defendant, who she did not expect to see that night, and did not open the front door. She went back to the bedroom, woke up Yarbor and asked him to leave so there would not be "an altercation."

¶ 12 Once Yarbor woke up, he also heard the knocking and then heard the front door beginning to unlock. As Strickland returned to the front door, Yarbor left the bedroom and went to the backdoor to leave. According to Strickland, she was standing by the front door with the door cracked open and had a conversation with defendant. Defendant told her that he could see Yarbor trying to leave through the backdoor, and he began pushing against the front door trying to get inside. Strickland pushed back, hoping to give Yarbor time to leave. Strickland testified that defendant had a key to the house, but explained he had taken the key after they had been in an "altercation" the last time he was at her house. According to Yarbor, he observed Strickland pushing against the front door and eventually, he quickly exited the residence fearing a "confrontation." Once Yarbor left the house, defendant stopped pushing the front door. Strickland observed defendant go to his car, which gave her time to shut the door and lock it. She also went to the back door and locked it.

¶ 13    Once Yarbor was outside, he did not immediately run to his car, which was parked directly in front of Strickland's house, because he wanted to make sure he could safely reach it. Instead, Yarbor remained between Strickland's house and a neighbor's house, and watched the front of Strickland's house. Yarbor then observed someone leave Strickland's house, enter a white vehicle that was parked in the driveway and drive away from the house. Yarbor waited a little while longer and then went to his own vehicle and left Strickland's house. As Yarbor drove away, he observed another vehicle in the opposite direction. The driver of that vehicle started the engine, turned on the lights and blocked Yarbor's path on the road. Yarbor recognized the vehicle as the same one that had been in Strickland's driveway. Yarbor suddenly observed the driver stick a firearm out of the window. Yarbor put his vehicle in reverse and tried to drive away. But the driver of the other vehicle drove toward him, pulled alongside him and again stuck the firearm out of the window. Yarbor put his vehicle in drive, ducked and "floored it" to get away. As he was driving away, he heard a gunshot, and his front passenger side and rear driver's side windows shattered. Yarbor drove to a gas station and called the police. At trial, Yarbor denied shooting at the white vehicle, let alone possessing a firearm that night.

¶ 14    Meanwhile, after defendant and Yarbor had left her house, Strickland tried calling both of them, but no one picked up their cell phones. About 5 to 10 minutes later, defendant called her back, and he was "angry" and "crying." Defendant told Strickland that she needed to open her front door and talk to him. Strickland went to the door, opened it and let defendant inside. Once inside, defendant remained angry and began pacing back and forth.

¶ 15    Several police officers received dispatches about the incident and arrived at the gas station, including Cook County Sheriff's Officer Willie Lewis and Cook County Sheriff's Detective Mike Cokeley. Both observed Yarbor's vehicle with the front passenger side and rear driver's side

windows shattered. Officer Lewis spoke with Yarbor, who explained what happened and provided a description of the white vehicle. Detective Cokeley also spoke with Yarbor and helped search Yarbor's vehicle, but no weapon was found, though Detective Cokeley acknowledged not putting this detail in his police report. Yarbor indicated to Officer Lewis that he was concerned about Strickland, so Yarbor and Officer Lewis went to her house. When Officer Lewis arrived at Strickland's house, he observed a white vehicle in the driveway that matched the description of the vehicle that Yarbor had provided. Yarbor likewise observed the vehicle and, at trial, identified it as the one he had seen earlier, but he was unable to ever see the face of the driver. Officer Lewis proceeded to speak with defendant and Strickland. Defendant told him that the vehicle in the driveway was "the company's car" and that he lived at the house as well as another residence in Gary, Indiana. Because Yarbor's description of the vehicle matched the vehicle in the driveway, defendant was taken into custody and brought to the police station.

¶ 16   Cook County Sheriff's Sergeant Ron Sachtleben processed the area near Strickland's house for evidence. On the street by her house, Sergeant Sachtleben observed shattered glass and a spent shell casing, but never found the fired bullet. He also observed the white vehicle in Strickland's driveway and noted there had been no damage to the vehicle. Sergeant Sachtleben subsequently went to the gas station where Yarbor had driven and observed that two of his windows were shattered. Sergeant Sachtleben searched Yarbor's vehicle, but found no firearms or anything else of evidentiary value, though he did not look to see if Yarbor's vehicle had any hidden compartments. Sergeant Sachtleben did not perform a gunshot residue test on Yarbor or any area of his vehicle. At trial, Sergeant Sachtleben explained that he did not perform either test because there was no evidence suggesting that a weapon had been fired from inside Yarbor's vehicle.

¶ 17     At the police station, Detective Cokeley and his partner, Detective Vega, interviewed defendant. Initially, Detective Cokeley read defendant his *Miranda* rights, and defendant agreed to speak with the detectives. Defendant told them that he had been at his sister's house watching a basketball game and decided to go to Strickland's house. As he was about to enter the front door using his own keys, he looked through the picture window and observed a man trying to get out of the house through the backdoor. According to defendant, Strickland was blocking the front door and preventing him from entering. Defendant yelled into the house "I see you," but Strickland told him to stop and leave. Defendant then went around to the back of the house to look for the man, but could not find him. Defendant entered his car and drove around the block looking for the man, but again to no avail.

¶ 18     As defendant returned to Strickland's street, he observed a black Cadillac, which was the same car he had seen in front of Strickland's house when he arrived. The vehicle was in motion and as defendant's vehicle crossed paths with the black Cadillac, he retrieved a semi-automatic firearm he had in the car and shot at the black Cadillac one time. Afterward, defendant returned to Strickland's house, told her that he had looked for the man who had been there and shot at his vehicle. Defendant told the detectives that he "hid" the firearm behind Strickland's water heater. According to Detective Cokeley, at no point did defendant indicate that Yarbor had fired a weapon at him. Based on Detective Cokeley's conversation with defendant, Sergeant Sachtleben returned to Strickland's house and located a loaded firearm in a closet near her water heater. At trial, Strickland testified that defendant owned several guns, but denied that he regularly kept his weapons near her water heater. Detective Cokeley also attempted to have a follow-up conversation with Yarbor and contacted him at the number he provided, but he never returned Detective Cokeley's phone call.

¶ 19    The following day, Boris Djulabic, a Cook County assistant State's Attorney, came to the police station and informed defendant of his *Miranda* rights. Defendant indicated that he was willing to speak and would allow Djulabic to put his verbal statement into writing. While in the presence Detectives Cokeley and Vega, defendant again provided a statement and Djulabic transcribed it. In the statement, defendant stated that he lived in Gary and also at the house in Ford Heights. Around midnight of April 27, 2014, defendant went to his house in Ford Heights and noticed a "strange" black Cadillac parked in front. As defendant opened the front door of the house, through the blinds he observed a large man trying to get out the back door. Defendant ran around to the back to look for the man, but could not find him. Defendant returned to the front of house and noticed the black Cadillac was gone. Defendant entered his car and drove around looking for the vehicle, but again could not find the black Cadillac.

¶ 20    As defendant was driving back to his house in Ford Heights, he saw the black Cadillac driving in the opposite direction. As both vehicles were about to pass one another, defendant reached for his firearm and put his arm out of the window. After the vehicles passed one another, defendant "shot at the car" because he recognized it as "the car from in front of his house." Defendant stated he had aimed for the vehicle's tire, but had to angle his arm to get the shot off. When he returned to his Ford Heights house, he "put the gun away behind the water heater," the place he normally kept his firearm when at the house. Eventually, the police arrived at his house and asked if there was a firearm inside. Defendant initially told them there was not, which he acknowledged was a lie, but explained that he was "shook up." Defendant further told Djulabic: "[L]ooking back on it he '100 percent regrets' shooting at the black Cadillac, and that he is sorry, and wishes things went differently." According to Djulabic, at no point did defendant indicate that anyone had fired a weapon at him or that he was acting in self-defense.

¶ 21    Anthony Spadafora, a forensic scientist with Northeastern Illinois Regional Crime Laboratory, examined the firearm found in Strickland's house and the spent shell casing found on the street near her house. He determined that the casing had been fired from the firearm.

¶ 22                                    2. The Defense's Case

¶ 23    In the defense's case, defendant was the only witness. He testified that he was the director of security for a company that owned several properties and was licensed to carry a concealed firearm in Illinois and Indiana. As part of his employment, he was required to carry a firearm. Defendant testified that he was currently married to Strickland, and in late April 2014, they had been married for eight years and were living together in the Ford Heights residence. They had lived together in Gary and although defendant still had that house, they were "consolidating" to just the Ford Heights house. Although Strickland had a son from a previous relationship, defendant was raising him as his own. At that time, according to defendant, he and Strickland were not separated, and he was with her "[e]very day." In fact, a few weeks prior, they went on vacation together to Reno, where they traded in Strickland's old ring and purchased a new one. At trial, defendant identified photographs of them taken on April 2, 2014, where they were kissing, and Strickland was showing off her new ring. Defendant characterized his relationship with Strickland in late April 2014 as "[l]oving."

¶ 24    Defendant testified that, in the evening of April 26, 2014, he went to his sister's residence to pick up some food and stayed for a little while to watch a basketball game that was on television. As he drove home to the Ford Heights residence, he had his firearm located in the center console of his vehicle. Defendant arrived home, and as he put his key into the door, he could see a large man "running out of the house." Defendant immediately thought there had been a home invasion and the man had "maybe murdered [his] wife and [his] son." Although defendant had his cell

phone on him, he did not call the police nor immediately check on the safety of his family. Instead, he ran around to the back of the house to search for the man, but did not see anyone. When defendant returned to the front of the house, he heard tires screeching and observed a black Cadillac that had been parked outside his house when he arrived. Suddenly, defendant heard a gunshot and glass shattering. Defendant still did not call the police or immediately check on the safety of his family. Instead, he got into his own vehicle and took off after the black Cadillac. Defendant testified that, after hearing the gunshot, he "was in fear of [his] life" and "also the life of [his] family."

¶ 25    Eventually, defendant's vehicle and the black Cadillac were facing each other, and the black Cadillac started to drive directly toward him at a high rate of speed, "as if [the driver] was going to kill" him. Defendant could not get out of the way of the black Cadillac, so he grabbed his firearm and shot once at the black Cadillac's tire to try and disable it. Defendant was not sure if his gunshot had hit the black Cadillac, but the vehicle left the scene. Defendant returned to his house to check on his family, but Strickland was not answering his questions. Eventually, he learned Strickland had cheated on him. While at his house, he placed his firearm next to the water heater, the place where he always put his firearm.

¶ 26    Soon after, the police arrived at his house and talked to him. Upon questioning, defendant told them that the white vehicle at the house belonged to him. The police put him in handcuffs and placed him in a squad car. In the car, defendant told two officers that he observed a large man running through his house and that he had been shot at by someone. After defendant arrived at the police station, Detectives Cokeley and Vega informed defendant of his *Miranda* rights, which he was familiar with due to his education and career, and he agreed to talk to them about what

happened. Defendant told the detectives that he thought there had been a home invasion and that someone had fired a gunshot at him, but "they were not listening to [him]."

¶ 27    Later, Djulabic came to interview defendant, but he denied that Djulabic informed him of his *Miranda* rights. Despite Djulabic not reading defendant his *Miranda* rights, defendant, who felt "a little" threatened by the detectives, discussed what happened because the detectives told him he "needed to tell [Djulabic] exactly what [he] told them." Defendant acknowledged People's Exhibit No. 18, which was the typewritten statement of his by Djulabic, and agreed that the statement included a section containing the *Miranda* rights and his signature indicating that he understood those rights. Defendant claimed that the detectives and Djulabic "coerced" him into what to say, but conceded to signing the statement. Defendant testified that Djulabic omitted from his statement that he had been shot at by someone.

¶ 28                                3. Closing Arguments

¶ 29    In the State's closing argument, it argued the facts of the case were "simple," that defendant shot at Yarbor in "anger" without any legal justification and it had proven defendant guilty of aggravated discharge of a firearm. In the defense's closing argument, defense counsel argued that, when defendant arrived at the Ford Heights house, he did not have a conversation with Strickland and only observed a man running through his family's house, who he thought was a danger. According to defense counsel, after defendant began looking for the person who had been in his house, he heard a gunshot and then observed a vehicle driving right at him, all putting him in reasonable fear and necessitated the use of his own firearm. Defense counsel argued to the jury that both Strickland and Yarbor were incredible witness based on various aspects of their testimony and that the investigation of the incident was flawed from the police work, including the insufficient investigation of Yarbor, through Djulabic, who took defendant's statement. Based on

these flaws and what defendant observed on the night in question, defense counsel argued that the State had failed to meet its burden to prove him guilty beyond a reasonable doubt.

¶ 30 In rebuttal argument, the State commented on its burden of proof and highlighted that it had to prove defendant guilty beyond a reasonable doubt. The State added that:

"It's not beyond all doubt. It's not beyond a shadow of a doubt. It's beyond a reasonable doubt. Reasonableness. That's the key of what you're thinking about. The reasonableness of the testimony you heard. The reasonableness of the physical evidence that corroborates what Mr. Yarbor told you from that witness stand. That's what you are thinking about. And it is a burden. That it is met every day in courtrooms across this country. It's not an impossible burden. It's a burden beyond a reasonable doubt. And the evidence in this case is overwhelming."

Following its comments, the State implored the jury to consider the evidence from trial, in particular defendant's statements soon after he fired his weapon, and once again asked the jury to find him guilty of aggravated discharge of a firearm.

¶ 31                              4. Jury Verdict, Posttrial and Sentencing

¶ 32 Approximately 70 minutes after the jury retired to the jury room, it found defendant guilty of both counts of aggravated discharge of a firearm. Defendant subsequently filed an unsuccessful posttrial motion for new trial, and the case proceeded to sentencing.

¶ 33 Defendant's presentence investigative report showed that he had earned an Associate of Arts in Business Administration from American Intercontinental University in 2011. From 2010 to 2014, defendant was employed as a security manager with Securitas in Indiana, but lost his position due to being arrested in the instant case. From 2014 until he was incarcerated for the instant offenses, defendant was employed as the director of security at the John Hancock building

in Chicago. Additionally, the presentence investigative report revealed that defendant had no criminal background and no prior arrests.

¶ 34    At defendant's sentencing hearing, he presented four witnesses: Terrence Holmes, his niece's husband; Sonya Brown, his oldest sister; Songia Brown, his niece; and Martha Brown, his mother. All four witnesses testified that defendant was an upstanding individual who had led an exemplary life but made a mistake. Defendant also spoke and apologized for his "judgments and [his] actions." He asked the court to provide him with a "second chance" so that he could continue to be a "productive citizen."

¶ 35    During argument, the State highlighted defendant's exemplary background but asserted that he "should have known better." The State observed that he "made a decision on that night that could have had very grave consequences" and noted that the gunshot defendant fired could have hit Yarbor, "anyone out on that street that night," or gone through a window and hit someone in their home. Because defendant engaged in "extremely dangerous behavior" and because others in similar situations needed to be deterred, the State argued that a period of incarceration was justified. Defense counsel highlighted defendant's upstanding background and employment history, and conceded to defendant's "one mistake." But counsel posited that defendant had already been significantly punished for his actions, including losing his job and being left with "no assets." Counsel argued that, under the circumstances, probation was warranted.

¶ 36    Following the parties' arguments, the trial court observed that "there's a lot of mitigation," including defendant's punctuality for every court appearance, his consistent respect shown to the court, his lack of a criminal background, his strong work history and the evidence that he was a loving, family man. However, the court noted that defendant "made a grave mistake" and knowingly shot at another person in a vehicle, which could have had far different ramifications.

Given the gravity of the mistake, the court determined that "probation would certainly deprecate the seriousness" of what defendant did. While the court did not believe probation was warranted, it did find the minimum sentence of prison appropriate. The court merged Count 2 into Count 1, and it sentenced defendant to four years' imprisonment on Count 1. The court subsequently denied defendant's motion to reconsider sentence, and this appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38                          A. Ineffective Assistance of Counsel

¶ 39     Defendant first contends that his trial counsel provided ineffective assistance in multiple ways. For one, defendant argues that his counsel was ineffective when he failed to object to for cause or exercise an available peremptory challenge on prospective juror, Thomas Fleming, who was a chief in the Cook County Sheriff's Office and personally knew multiple officers involved in the case. In addition, defendant argues that his counsel was ineffective when he failed to request a jury instruction on the justified use of force by a private person in making a citizen's arrest where the theory of the defense was that defendant justifiably discharged his firearm while attempting to catch the person whom he believed had committed a home invasion and then threated his life afterward on the street.

¶ 40     To establish that trial counsel was ineffective, the defendant must satisfy the standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. Under this standard, he must show that his counsel's performance was deficient and the deficiency prejudiced him. *People v. Valdez*, 2016 IL 119860, ¶ 14. More specifically, the "defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Henderson*, 2013 IL 114040, ¶ 11. Both

prongs of the *Strickland* test must be met (*Valdez*, 2016 IL 119860, ¶ 14), and the defendant has the burden of persuasion. *People v. Peck*, 2017 IL App (4th) 160410, ¶ 26. Because the *Strickland* test contains two parts, we may review the prongs in any order (*People v. Lee*, 2016 IL App (1st) 152425, ¶ 56), and the failure to establish either precludes a finding of ineffective assistance of counsel. *Henderson*, 2013 IL 114040, ¶ 11.

¶ 41                    1. Failure to Remove Prospective Juror Fleming

¶ 42    Addressing defendant's claim that his counsel was ineffective when he failed to remove prospective juror Fleming with an available peremptory challenge or move to discharge Fleming for cause, assuming *arguendo* that counsel was ineffective in this manner, defendant has failed to show that he was prejudiced by counsel's inactions. Defendant was charged with two counts of aggravated discharge of a firearm and asserted self-defense. In order to prove him guilty of the two offenses under the circumstances, the State had to prove that he: (1) knowingly discharged a firearm; (2) in the direction of either (i) another person or (ii) a vehicle he knew or reasonably should have known to be occupied by a person; and (3) he was not justified in using the force he used. 720 ILCS 5/7-1(a), 5/24-1.2(a)(2) (West 2014); see also *People v. Williams*, 2015 IL App (1st) 130097, ¶ 26 (listing the elements the State has to prove to convict a defendant of aggravated discharge of a firearm when he raises self-defense).

¶ 43    The evidence at trial indisputably showed that defendant was the individual who knowingly discharged a firearm in the direction of Yarbor and his vehicle. First, Yarbor testified to this fact, and the physical evidence demonstrated that the spent shell casing found on Strickland's street came from the firearm defendant placed behind the water heater in Strickland's house. But more importantly, defendant's own words proved that he knowingly discharged a firearm in the direction of Yarbor and his vehicle. In defendant's statements to Djulabic, the assistant State's Attorney,

and Detective Cokeley after the incident, he admitted firing his weapon at the moving black Cadillac. Furthermore, at trial, defendant readily conceded that he shot at the black Cadillac with someone inside, but asserted that he did so aiming at the vehicle's tire to try and disable it as it was barreling toward him. As such, the third element of the offenses—whether defendant was justified in discharging his firearm—was the only element of offenses that was truly in dispute.

¶ 44    But the evidence that defendant was not justified in discharging his firearm was overwhelming. While the precise nature of Strickland and defendant's relationship in late April 2014 was unclear and the evidence reasonably supported inferences that Strickland was having an affair or she was estranged from defendant, the evidence undoubtedly showed that defendant shot at Yarbor out of a fit of anger after observing him leave through the backdoor of Strickland's house knowing he had not committed a home invasion and knowing he posed no threat.

¶ 45    In Strickland's testimony, she stated that she had a conversation with defendant at the front door of the house and tried to prevent him from entering the house. Yarbor also observed Strickland go to the front door and try to prevent defendant from entering. Detective Cokeley testified to a conversation with defendant about the incident. According to Detective Cokeley, defendant told him that he and Strickland had a conversation at the front of the door and, at no point during their conversation did defendant indicate that Yarbor had a firearm. Rather, according to Detective Cokeley, defendant shot at Yarbor's vehicle without provocation as defendant's vehicle crossed paths with Yarbor's. Djulabic testified that he interviewed defendant and transcribed defendant's oral statement. According to the transcribed statement, defendant stated he shot at Yarbor's vehicle, and according to Djulabic, at no point did defendant indicate that anyone had fired a weapon at him or that he was acting in self-defense. Moreover, in the statement, defendant stated: "[L]ooking back on it, he '100 percent regrets' shooting at the black Cadillac,

and that he is sorry, and wishes things went differently." Defendant's statement to Djulabic is damning evidence and essentially an admission that he shot Yarbor without legal justification.

¶ 46    The only evidence that defendant was acting in self-defense was his own self-serving trial testimony that was contradicted by his statements to Djulabic and Detective Cokeley shortly after the incident and the version of events testified to by Strickland and Yarbor. Although the defense's theory was that Yarbor and Strickland were lying, and that Detective Cokeley and Djulabic omitted details of their conversations where defendant indicated that he acted in self-defense, no physical evidence or additional testimony supported defendant's claim of self-defense. See *People v. Peterson*, 171 Ill. App. 3d 730, 735 (1988) ("By electing to testify, defendant became bound to provide a reasonable account of events or be judged by their improbabilities and inconsistencies.") Simply stated, defendant testified to an unbelievable version of events that the jury, who returned guilty verdicts in a mere 70 minutes, rejected almost instantaneously. Given the overwhelming evidence that defendant knowingly discharged a firearm in the direction of Yarbor's occupied vehicle without lawful justification, even if trial counsel had exercised a peremptory challenge to remove Fleming as a juror or successfully moved to strike him for cause, there is no reasonable probability that the outcome of defendant's trial would have changed. Because defendant cannot demonstrate he was prejudiced by his counsel's inactions, his claim of ineffective assistance of counsel fails. See *Henderson*, 2013 IL 114040, ¶ 11.

¶ 47                    2. Failure to Request Jury Instruction on Citizen's Arrest

¶ 48    We now turn to defendant's claim that his counsel was ineffective when he failed to request a jury instruction on the justified use of force by a private person in making a citizen's arrest where the theory of the defense was that defendant justifiably discharged his firearm while attempting to catch the person whom he believed had committed a home invasion and then threated his life

afterward on the street. Under section 107-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107-3 (West 2014)), "[a]ny person may arrest another when he has reasonable grounds to believe that an offense other than an ordinance violation is being committed." Furthermore, "[a] private person who makes *** a lawful arrest is justified in the use of any force which he would be justified in using if he were summoned or directed by a peace officer to make such arrest, except that he is justified in the use of force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or another." 720 ILCS 5/7-6(a) (West 2014). These principles of law are embodied in Illinois Pattern Jury Instructions, Criminal, No. 24-25.16, which is titled "Private Person's Use Of Force In Making Arrest—Not Summoned By Peace Officer." The instruction states:

> "A private person who [(makes) (assists another private person in making)] a lawful arrest need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend [(himself) (another)] from bodily harm while making the arrest.
>
> [However, he is justified in using force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent death or great bodily harm to [(himself) (another)].]"

*Id.* This is the instruction defendant posits that counsel should have proposed to the trial court. In addition, according to defendant, counsel should have complimented this instruction with a general instruction that defined a private person's authority to make a citizen's arrest.

¶ 49    If trial counsel had requested the jury be instructed with Illinois Pattern Jury Instructions, Criminal, No. 24-25.16, as well as the complimentary instruction defining a private person's authority to make a citizen's arrest, and the trial court allowed these instructions, for the jury to have believed that defendant was justified in attempting to make a citizen's arrest, it would have had to first believe that defendant had reasonable grounds to believe that Yarbor committed an offense. See 725 ILCS 5/107-3 (West 2014) ("Any person may arrest another when he has reasonable grounds to believe that an offense other than an ordinance violation is being committed."). But similar to defendant's first claim of ineffective assistance of counsel, the evidence overwhelmingly demonstrated that defendant knew Yarbor did not commit a home invasion and posed no threat to him. Again, the only evidence supporting the claim that Yarbor may have committed a crime or posed a danger was defendant's self-serving trial testimony that was contradicted by all other trial testimony and the physical evidence. Given the overwhelming evidence that defendant knowingly discharged of a firearm in the direction of Yarbor's occupied vehicle without lawful justification, even if trial counsel had successfully requested Illinois Pattern Jury Instructions, Criminal, No. 24-25.16 and the complimentary instruction defining a private person's authority to make a citizen's arrest, there is no reasonable probability that the outcome of defendant's trial would have changed. Because defendant cannot demonstrate he was prejudiced by his counsel's inactions, his claim of ineffective assistance of counsel fails. See *Henderson*, 2013 IL 114040, ¶ 11.

¶ 50                              B. Rebuttal Closing Argument

¶ 51    Defendant next contends that he was deprived of a fair trial where, during rebuttal closing argument, the State improperly provided the jury with a definition of reasonable doubt that minimized its burden of proof.

¶ 52 It is axiomatic that the State has the burden of proof in a criminal trial. *People v. Howery*, 178 Ill. 2d 1, 32 (1997). And although during closing argument, the State has wide latitude in its remarks (*People v. Wheeler*, 226 Ill. 2d 92, 123 (2007)), comments during argument by the State that minimize its burden of proof are improper. *People v. Ligon*, 365 Ill. App. 3d 109, 125 (2006). Such comments often deny the defendant his constitutional right to a fair trial. *People v. Adams*, 281 Ill. App. 3d 339, 346 (1996). Furthermore, it is well-established that neither the trial court nor the attorneys should attempt to define reasonable doubt for the jury. *People v. Downs*, 2015 IL 117934, ¶ 19 (citing cases). This is because " 'reasonable doubt' is self-defining and needs no further definition." *Id.*

¶ 53 Defendant, however, concedes that he did not object to the allegedly prejudicial comments during the State's rebuttal closing argument, which generally results in the defendant forfeiting appellate review of the issue. *People v. Sebby*, 2017 IL 119445, ¶ 48. However, defendant asserts that we may review the State's comments for plain error. Under the plain-error doctrine, we may review an unpreserved claim of error if there was a clear or obvious error, and either (1) the evidence was so closely balanced that the error, by itself, threated to tip the scales of justice against the defendant, regardless of the gravity of the error, or (2) the error was so serious that it resulted in an unfair trial to the defendant and challenged the integrity of the judicial process, regardless of how close the evidence was at trial. *Id.* The defendant has the burden to show plain error occurred (*People v. Thompson*, 238 Ill. 2d 598, 613 (2010)), and the first step under the doctrine is to determine whether there was a clear or obvious error. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 54 The first comments at issue were when, after the State informed the jury that the burden of proof was beyond a reasonable doubt, it stated:

"It's not beyond all doubt. It's not beyond a shadow of a doubt. It's beyond a reasonable doubt. *** And it is a burden. That it is met every day in courtrooms across this country. It's not an impossible burden. It's a burden beyond a reasonable doubt. And the evidence in this case is overwhelming."

¶ 55   Although neither the trial court nor the attorneys should attempt to define reasonable doubt for the jury (see *Downs*, 2015 IL 117934, ¶ 19), "[a] prosecutor may argue that the State does not have the burden of proving the guilt of the defendant beyond *any* doubt, that the doubt must be a reasonable one." (Emphasis in original.) *People v. Carroll*, 278 Ill. App. 3d 464, 467 (1996). To this end, our supreme court has previously found substantially identical comments from the State during closing argument to be proper and not minimize its burden of proof. See *People v. Moore*, 171 Ill. 2d 74, 104 (1996) (finding nothing improper with the State asserting " '[defense counsel] would have you believe there's an impossible burden to be met, but the burden here is the same burden as in every courtroom in this building and every courtroom in Will County, going on everywhere in the United States from 1776 to date, and it's met every single day' "); *People v. Phillips*, 127 Ill. 2d 499, 527-28 (1989) (finding nothing improper with the State asserting that the reasonable doubt standard " 'is the same standard, the same burden that is applicable in all criminal cases. *** Every criminal case that is tried in this courtroom, in this county, in this state and in this country in any type of criminal case' " and the State remarking that reasonable doubt " 'is not proof beyond all doubt, it is not proof beyond any doubt, it is proof beyond a reasonable doubt' ").

¶ 56   Similarly, the appellate court has previously found substantially identical comments from the State during closing argument to be proper and not minimize its burden of proof. See *People v. Thompson*, 2013 IL App (1st) 113105, ¶¶ 90-91 (finding nothing improper with the State asserting that the reasonable doubt standard " 'isn't beyond any doubt in the world, any crazy

doubt' ") (Emphasis omitted); *People v. Burney*, 2011 IL App (4th) 100343, ¶¶ 66-68 (finding nothing improper with the State asserting that the reasonable doubt standard " 'does not mean beyond all doubt' "); *People v. Laugharn*, 297 Ill. App. 3d 807, 810-12 (1998) (finding nothing improper with the State asserting that the reasonable doubt standard is " 'not beyond all doubt or any doubt' ") (Emphasis omitted). In the present case, the State discussed the reasonable doubt standard in substantially similar terms to the State's remarks in *Moore*, *Phillips*, *Thompson*, *Burney* and *Laugharn*, which were all deemed proper. Consequently, the State's remarks did not minimize its burden of proof and were proper.

¶ 57     Nevertheless, defendant highlights this court's decisions in *People v. Burman*, 2013 IL App (2d) 110807 and *People v. Mena*, 345 Ill. App. 3d 418 (2003). In *Burman*, 2013 IL App (2d) 110807, ¶ 40, the State asserted in closing argument that reasonable doubt was " 'not beyond all doubt' " and was " 'not beyond an unreasonable doubt.' " This court criticized the State for its comments and found them to improperly define reasonable doubt by "describing what it is not." *Id.* ¶ 44. In *Mena*, 345 Ill. App. 3d at 427, the State asserted in closing argument that it " 'need not prove guilt beyond all doubt, and that juries across the country find evidence in other cases sufficient to meet the burden.' " This court criticized the State for its comments and found them to be improper. *Id.* However, both decisions stand in contrast to *Moore*, *Phillips*, *Thompson*, *Burney* and *Laugharn*, and the weight of authority goes against both decisions. See *People v. Moody*, 2016 IL App (1st) 130071, ¶ 65 (noting the contrast between other cases and *Burman*); *People v. Ward*, 371 Ill. App. 3d 382, 422-23 (2007), *abrogated on other grounds by People v. Ayres*, 2017 IL 120071 (noting the contrast between other cases and *Mena*). The decisions in *Burman* and *Mena* therefore do not persuade us that the State's remarks minimized its burden of proof.

¶ 58    But, in any event, both courts in *Burman*, 2013 IL App (2d) 110807, ¶ 47 and *Mena*, 345 Ill. App. 3d at 427, found that the State's comments did not rise to the level of reversible error. Although we do not find the State's comments to be improper, assuming *arguendo* that they were improper under *Burman* and *Mena*, they clearly would not have risen to the level of plain error.

¶ 59    The second and final comments at issue during the State's rebuttal closing argument were when it stated: "Reasonableness. That's the key of what you're thinking about. The reasonableness of the testimony you heard. The reasonableness of the physical evidence that corroborates what Mr. Yarbor told you from that witness stand. That's what you are thinking about." According to defendant, the State's comments here equated proof beyond a reasonable doubt to evidence that is merely reasonable. Although this comment by the State was juxtaposed with its various comments about reasonable doubt, there was nothing improper about what the State stated here, as its comments were merely asking the jury to consider *the testimony* in the case and determine whether it was reasonable. These comments were fair and did not seek to minimize its burden of proof.

¶ 60    Because all of the State's comments during rebuttal closing argument were proper, defendant has failed to carry his burden to show that a clear or obvious error occurred, and therefore, has failed to show plain error. See *Sebby*, 2017 IL 119445, ¶ 49.

¶ 61    Defendant alternatively argues that his trial counsel was ineffective for not objecting to the State's improper comments, which would have resulted in him preserving his claim of error. But because there was no clear or obvious error, there cannot be ineffective assistance of counsel. See *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47.

¶ 62                                C. Excessive Sentence

¶ 63    Defendant lastly contends that his four-year sentence was excessive, and he should have been sentenced to probation, in light of his "spotless" background, his potential for rehabilitation

and where the court improperly relied on a factor implicit in the offense as the sole basis for denying probation. Defendant accordingly requests that we reduce his sentence to probation.

¶ 64    Illinois Supreme Court Rule 615(b) provides the powers of the reviewing court on appeal and, in part, allows this court to "reduce the punishment imposed by the trial court." However, in in *People ex rel. Ward v. Moran*, 54 Ill. 2d 552, 556 (1973), our supreme court asserted that "Rule 615 *** was not intended to grant a court of review the authority to reduce a penitentiary sentence to probation." Two years later, in *People v. Bolyard*, 61 Ill. 2d 583, 588 (1975), our supreme court reiterated that "Rule 615 does not grant a reviewing court the authority to reduce a sentence of imprisonment to a sentence of probation." Recently, in *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 25, this court cited both *Moran* and *Bolyard*, and observed that "[o]ur supreme court has twice stated we categorically do not have the authority to reduce a prison sentence to a sentence of probation." See also *People v. Stutzman*, 2015 IL App (4th) 130889, ¶ 40 (recognizing the same); *People v. Bruer*, 335 Ill. App. 3d 422, 428 (2002) (recognizing the same). Similarly, "[the appellate court does] not have authority to remand a cause with directions to grant probation." *Lawson*, 2018 IL App (4th) 170105, ¶ 25 (citing *People v. Rege*, 64 Ill. 2d 473, 482 (1976)). The only relief we could afford defendant would be to reverse his sentence and remand the matter to the trial court for resentencing by a different trial judge. See *Bolyard*, 61 Ill. 2d at 589; *Moran*, 54 Ill. 2d at 557. Nevertheless, the trial court's sentence was appropriate given the circumstances of the case.

¶ 65    The Illinois Constitution requires trial courts to impose sentences according to the seriousness of the offense and with the objective of restoring the defendant to useful citizenship (Ill. Const. 1970, art. I, § 11), or, in other words, to consider the defendant's rehabilitative potential. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. In Illinois, the legislature prescribes the

permissible sentencing ranges for criminal offenses, and the trial courts impose a sentence within the legislatively prescribed range. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. Due to defendant's lack of a criminal background and the offense of which he was convicted, he was eligible for probation. See 730 ILCS 5/5-5-3 (West 2014). Because of his eligibility, the trial court was required to impose probation as the sentence "unless, having regard to the nature and circumstance of the offense, and to the history, character and condition of the offender, the court is of the opinion that: (1) his imprisonment or periodic imprisonment is necessary for the protection of the public; or (2) probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice." 730 ILCS 5/5-6-1(a)(1), (2) (West 2014). If the court found either applicable, the sentencing range for aggravated discharge of a firearm in the direction of another person or in the direction of a vehicle he knows or reasonably should know to be occupied by a person was between 4 and 15 years' imprisonment. 720 ILCS 5/24-1.2(a)(2), (b) (West 2014); 730 ILCS 5/5-4.5-30(a) (West 2014).

¶ 66    In determining the proper sentence, trial courts are given broad discretionary powers (*People v. Alexander*, 239 Ill. 2d 205, 212 (2010)), and a sentence will not be reversed absent an abuse of that discretion. *People v. Geiger*, 2012 IL 113181, ¶ 27. Reviewing courts provide such deference to the trial court because it had "the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). When a sentence falls within the statutory range, it is presumed to be proper (*People v. Knox*, 2014 IL App (1st) 120349, ¶ 46), and may only be "deemed excessive and the result of an abuse of discretion" where it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 67    In this case, defendant's four-year sentence was within the statutory range for the offense, and in fact, the minimum sentence of incarceration. Thus, defendant's sentence is presumptively proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46. In sentencing defendant to the minimum period of incarceration over probation, the trial court readily acknowledged the various mitigation in defendant's favor, including his punctuality for every court appearance, his consistent respect shown to the court, his lack of a criminal record, his strong work history and the evidence that he was loving, family man. But the court contrasted that mitigation with the seriousness of the offense itself, where defendant shot at Yarbor's occupied vehicle out of a fit of anger. The court observed that defendant was lucky that only Yarbor's windows had been shattered and the result of defendant firing his weapon could have had much graver consequences. Thus, when declining to sentence defendant to probation, the court considered, as required, "the nature and circumstance of the offense" in addition to "the history, character and condition of the offender." 730 ILCS 5/5-6-1(a) (West 2014). Because the court considered the requisite circumstances involved in deciding whether to sentence defendant to probation or a period of incarceration, and there is no doubt as to the seriousness of firing a weapon toward an occupied vehicle, the court properly found that probation would deprecate the seriousness of defendant's conduct and therefore, would be inconsistent with the ends of justice.

¶ 68    Defendant, however, posits that the sole reason the trial court denied him probation was because he chose to discharge his firearm into an occupied vehicle and highlights the court's statement that it felt "probation would certainly deprecate the seriousness of what [defendant] did on this day" where "[h]e chose to discharge that firearm in an [*sic*] occupied vehicle." Defendant argues that, because firing into an occupied vehicle was already an element of the offense for

which he was convicted, the court improperly considered this fact as an aggravated sentencing factor to justify the denial of probation.

¶ 69    Generally, a factor that is inherent in the offense for which a defendant was convicted may not be used as an aggravating factor in sentencing him. *People v. Kuntu*, 196 Ill. 2d 105, 131 (2001). This is because using such a factor would constitute a double enhancement as it is presumed " 'the legislature considered the factors inherent in the offense in determining the appropriate range of penalties for that offense.' " *Id.* at 131-32 (quoting *People v. Rissley*, 165 Ill. 2d 364, 390 (1995)). "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). Although defendant highlights one remark by the trial court, a review of the court's entire remarks when sentencing defendant reveals that the court justified its denial of probation based upon the threat of harm defendant's actions presented that day, not the mere fact he discharged his firearm. "[T]he threat of serious harm is not an inherent element of the offense of aggravated discharge of a firearm, which only requires that a defendant fire in the direction of a person or occupied." *People v. Ellis*, 401 Ill. App. 3d 727, 731 (2010). As such, the trial court could consider and properly did consider the fact that defendant's discharge of a firearm threatened serious harm in finding that probation would deprecate the seriousness of his conduct.

¶ 70    Nevertheless, defendant relies on *People v. Daly*, 2014 IL App (4th) 140624, in arguing that probation was the proper sentence for him. In *Daly*, this court reduced a defendant's 42-month prison sentence for reckless homicide to probation where, in part, the trial court's comments showed that it "appeared to be sentencing [the] defendant as if she had been convicted of aggravated DUI," not reckless homicide. *Id.* ¶¶ 1, 35, 40. The court also exhibited "a predisposition

against probation for certain types of offenders" and considered a factor inherent in an offense as an aggravating factor in sentencing the defendant. *Id.* ¶¶ 36-39. Furthermore, in the trial court, the State recommended probation for the defendant, and, on appeal, the State conceded that the defendant had been inappropriately sentenced. *Id.* ¶¶ 6, 27. Nothing similar occurred in this case, and thus, defendant's reliance on *Daly* is unpersuasive. Given that the trial court properly found that probation would deprecate the seriousness of defendant's conduct and it did not rely on a factor inherent in the offense as an aggravating sentencing factor, we have no basis to find that the court abused its discretion in sentencing defendant to the minimum period of incarceration rather than probation.

¶ 71                          III. CONCLUSION

¶ 72     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 73     Affirmed.