THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANCISCO MENA, Defendant-Appellant.

First District (1st Division)   No. 1—98—1326

Opinion filed December 22, 2003.

Michael J. Pelletier and Kathleen M. Flynn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Alan Spellberg, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

This case comes before us on a second remand from our supreme court. That court directed us to vacate and reconsider our initial opinion in this case in light of *People v. Swift*, 202 Ill. 2d 378 (2002). We vacated *People v. Mena*, 329 Ill. App. 3d 579 (2002), and followed *Swift*. Our supreme court subsequently directed us to vacate our second opinion and reconsider in light of *People v. Crespo*, 203 Ill. 2d 335 (2001) (supplemental opinion filed March 31, 2003), and *People v. Thurow*, 203 Ill. 2d 352 (2003). We now vacate *People v. Mena*, 338 Ill. App. 3d 1 (2003).

A jury found defendant, Francisco Mena, guilty of first degree murder. The trial court found that defendant committed the murder with exceptional brutality, and on that basis the court imposed an extended-term sentence. On appeal defendant contends that the trial court erred by refusing to instruct the jury on second degree murder, and prosecutorial misconduct deprived him of a fair trial. We reject both arguments and affirm the conviction. Defendant also challenges the extended-term sentence because the court based it on a factual finding on an issue never submitted for jury determination. On the direct appeal, and on reconsideration, we agreed with defendant, and remanded for resentencing. Upon further reconsideration, we find a reasonable probability that the jury could have concluded that the brutality of this murder did not qualify as exceptional. Because defendant showed prejudice caused by the deprivation of the due

process rights explained in *Swift*, we again vacate the sentence and remand for resentencing.

Around 3 a.m. on June 22, 1996, police officers arrived at the scene of a car collision. Gilberto Arteaga and Santos Chavez stood outside of Arteaga's car. Arteaga's car sustained major damage to its front end, especially on the driver's side. About 300 feet away, another car with major damage had come to rest at the side of the street. Police found the car's owner, Hector Saldana, facedown outside the passenger side of the car, with blood all around his head. He had died from multiple blunt force injuries.

Police found a jack covered in blood by a fence near the crash site. A forensic examiner found that the pattern of marks on Saldana's body appeared to match the pattern of ratchets on the jack.

An hour after the police arrived, Freddie Ayala and defendant came to the scene of the collision. An officer noticed that Ayala's shoes had spots that looked like blood, and defendant's shoes looked wet. Based on information gathered from others at the scene, an officer arrested Ayala and defendant. Another officer later remembered that he had seen defendant riding in Arteaga's car around 1 a.m. that night, two hours before the collision.

After 6:30 p.m. that day, about 14 hours after the arrest, defendant gave a statement recorded by a court reporter. Defendant said that on June 21, 1996, around 5 p.m., he went cruising with Arteaga, a fellow member of the Latin Kings. They picked up Ayala. While Arteaga drove on a local street, another car rammed the back of Arteaga's car. The occupants of the other car flashed signs indicating membership in the Two-Six gang, rivals of the Latin Kings. The collision flattened Arteaga's rear tire. Arteaga drove on it to a nearby alley.

According to the court-reported statement, Santos Chavez then joined defendant, Arteaga and Ayala. After they changed the tire, the four of them got in the car and went out looking for a Two-Sixer's car to ram. They saw such a car and chased it. It led them to a street where they saw many other Two-Sixers. Arteaga quickly turned his car and headed back east, towards Latin Kings territory. He saw a car following his.

Defendant said that Arteaga made a U-turn and headed west. The eastbound car that had followed them then crossed the center line and hit Arteaga's car, causing extensive damage. Defendant and Ayala jumped out of the car. Defendant told Arteaga to open the trunk. Defendant took a jack from the trunk and ran with Ayala to the other car, where they found Saldana lying in the front seat. Defendant said, [M]otherfucker, what you doing?'' When Saldana did not respond, defendant struck him with the jack. Saldana still made no response.

Defendant pulled him from the car and threw him on the ground. Defendant struck Saldana's head twice with the jack, and Ayala jumped on Saldana. According to defendant's statement, they attacked Saldana because he had wrecked Arteaga's car.

Defendant ran off and washed the blood off his clothes as well as he could. He went home and changed clothes, then threw his clothes in a trash can in a nearby alley. He then went over to Ayala's apartment. They returned to the collision site to check on Arteaga and Chavez.

Although defendant had no complaints about police treatment, he said he had not had any sleep the prior night. Because he worked on June 21 before meeting Arteaga, he had not slept in 36 hours. Police did not find defendant's clothes in the trash can where he said he threw them.

A grand jury indicted defendant for first degree murder. The charging instrument does not mention any facts that might warrant a death sentence or an extended-term sentence. The indictment does not charge defendant with exceptionally brutal and heinous conduct indicative of wanton cruelty.

At trial the prosecution first presented Saldana's sister, who testified that Saldana was 18 and working as a deliveryman since he moved from Mexico about a year before his death. Although the testimony had established the length of time Saldana lived in Chicago, the questioning continued:

> "Q. Do you remember when it was that Hector came from Mexico?
>
> A. He came back a day after my mother passed away, June 20th of '95.
>
> Q. Did he come for the funeral?
>
> A. Yes.
>
> Q. After the funeral, is that when he decided to stay here?
>
> A. Yes, he did."

The medical examiner found two large injuries to the back of Saldana's head. Each blow fractured the skull. Seven or eight back injuries showed the pattern of the jack. Extensive hemorrhaging under the scalp showed that Saldana was alive when the jack struck his head. Beneath the brain, the bottom of the skull also had been fractured. The medical examiner said that fracture proved massive force had been used. The injuries were not consistent with injuries caused by car accidents.

The trial court refused defendant's proposed instruction on second degree murder.

At the beginning of the closing argument, the prosecutor stressed

the loss society suffered from Saldana's murder, "[b]ecause of the insanity that has been brought about by street gangs." After discussing the evidence, the prosecutor invited the jury to tell gangs the streets "don't belong to the gangs." The jurors had "a phenomenal opportunity to send that message."

The defense emphasized the lack of physical evidence tying defendant to the crime scene and defendant's sleepless state when he made the court-reported confession.

In rebuttal the prosecution returned to the subject of gangs:

"[Defendant] chose to be a Latin King. And, ladies and gentlemen, let's not make any mistake about it. We are not asking you to convict him because he is a Latin King gang member. We are asking you to convict him because he is a cold-blooded murderer."

The prosecutor described the scene:

"Saldana is lying on the ground, choking on his last breath of life, drowning in his blood."

Later, he added:

"You know, it's amazing they never mention the rights of Hector Saldana. What about his rights? There was no one there to protect Hector's rights. This guy behind me was his judge, his jury, and his executioner.

\* \* \*

Counsel mentions our burden of proof in his argument. It is as if he expects [us] to cower under our table.

Well, ladies and gentlemen, that is our burden of proof, proof beyond a reasonable doubt. We embrace that burden. We welcome that burden.

Remember, it is proof beyond a reasonable doubt. It is not proof beyond all doubt. It is not proof beyond a shadow of a doubt. It is proof beyond a reasonable doubt. It is the same burden that juries in this building and juries across this country use to convict the likes of [defendant].

\* \* \*

Hector's sister was the very first person that you heard from during the course of this trial.

Thanks to [defendant], Hector will be forever 18 in [his family's] hearts and their mind[s]."

The jury found defendant guilty of first degree murder. Because the judge found the murder brutal and heinous, he sentenced defendant to an extended term of 90 years in prison.

Defense counsel failed to file an appellate brief. We dismissed the appeal for want of prosecution. Many months later defendant contacted a court clerk, seeking information about his appeal. The clerk told him the court dismissed the appeal for want of prosecution.

Defendant filed a petition for postconviction relief. The trial court dismissed the petition and defendant appealed. Defendant later moved this court to vacate the dismissal of the direct appeal. We granted the motion. We dispose of the appeal from denial of the postconviction petition by separate opinion. *People v. Mena*, 337 Ill. App. 3d 868 (2003). Here, we address the reinstated direct appeal.

## I

■ Defendant argues first that the court committed reversible error by denying his request for an instruction on second degree murder.

> "Whether to tender a jury instruction on voluntary manslaughter is within the discretion of the trial court. [Citation.] This discretion, however, is controlled by clear guidelines from this court. If there is evidence in the record that, if believed by the jury, would reduce a crime from murder to manslaughter, a defendant's request for a manslaughter instruction must be granted. [Citations.] Defendant has the burden of proving there is at least 'some evidence' of serious provocation or the trial court may deny the instruction. ***

> \* \* \*

> *** [T]he provocation must be proportionate to the manner in which the accused retaliated. The crime is murder when a defendant attacks a victim with violence out of all proportion to the provocation. This is especially true if the homicide is committed with a deadly weapon." *People v. Austin*, 133 Ill. 2d 118, 124-27 (1989).

Here, the prosecution presented some evidence of serious provocation: according to defendant's statement, which constituted the principal evidence against him, Saldana chased Arteaga and drove across the center line to ram the front of Arteaga's car. The photographs of the scene show the result of a very forceful collision in which Arteaga's passengers, including defendant, faced serious danger.

Defendant said that in response he grabbed a jack and ran to Saldana's car, where he found Saldana lying, unresponsive, across the front seat. He dragged him from the car and bashed his head with such force that he fractured the base of Saldana's skull. Then defendant bashed Saldana's head again.

Although the provocation here cannot be considered slight, the response to the provocation is disproportionate, especially because Saldana lay injured and unresponsive before defendant began hitting him. We cannot say that the trial judge abused his discretion by denying the second degree murder instruction.

## II

■ Next, defendant claims that prosecutorial misconduct deprived

him of a fair trial. He admits that he waived the issue by failing to object to the misconduct at trial, but he asks the court to review the issue for plain error. Under the plain error exception to the waiver doctrine, this court conducts a limited review of the record to determine whether the evidence was closely balanced or the errors were of such magnitude that they deprived the defendant of a fundamentally fair trial. *People v. Mitchell,* 155 Ill. 2d 344, 354 (1993).

While the prosecution has presented less than overwhelming evidence of defendant's guilt, we cannot characterize the evidence as closely balanced. An officer saw defendant in Arteaga's car two hours before the assault, and defendant arrived at the crime scene about one hour after police arrived. Defendant's confession explains both of these facts and fits well with the evidence at the crime scene. We note that the confession provided police no new information, apart from the means of disposing of the bloody clothes, and police did not find the clothes in the place described in the confession. But the court-reported confession shows that defendant narrated most of his responses to open-ended questions. The transcript does not show any special prompting of the answers, just as it does not show the interrogation process over the 14 hours defendant spent in custody leading up to his confession. In light of the consistency of the credible confession with all of the other evidence presented, we hold that the evidence is not closely balanced.

Thus, we review the alleged errors only under the second prong of the plain error rule. Even when a defendant has waived objections, this court must remedy error when necessary to preserve the integrity of legal proceedings. *People v. Vargas,* 174 Ill. 2d 355, 363 (1996). "A reviewing court will grant relief under the second prong of the plain error rule only if the error is so fundamental to the integrity of the judicial process that the trial court could not cure the error by sustaining an objection or instructing the jury to disregard the error." *Vargas,* 174 Ill. 2d at 363-64.

Defendant argues that prosecutors engaged in three separate kinds of misconduct. They improperly dwelt on the sufferings of Saldana and his family, they appealed to jurors' fears of street gangs, and they minimized the burden of proof.

On direct examination of Saldana's sister, the prosecutor asked for more specific information about Saldana's move to Chicago about a year before the murder. The objectionable question elicited the irrelevant and provocative testimony that Saldana's mother had died about one year before Saldana died. See *People v. Blue,* 189 Ill. 2d 99, 129 (2000). A sustained objection to the question would have prevented the elicitation of the prejudicial testimony and the prosecutor's two further references to the funeral of Saldana's mother.

A sustained objection also could have alleviated prejudice from improper comments in closing regarding the sufferings and memories of Saldana's family. See *People v. Childress*, 158 Ill. 2d 275, 298 (1994). Comments on the victim's rights, similar to those at issue here, did not mandate reversal in *People v. Smith*, 152 Ill. 2d 229, 268-69 (1992). No evidence supported the prosecutor's argument that Saldana drowned in his own blood. But the exceptionally violent beating, fracturing both the top and the base of Saldana's skull with a blow struck while Saldana was alive, lends itself to descriptions yet more lurid than the description the prosecutor posed. The remark about drowning is not likely to have been a material factor in the conviction. See *People v. Doran*, 256 Ill. App. 3d 131, 137 (1993). The improper remarks about the sufferings of Saldana and his family do not amount to plain error.

The prosecutor began closing argument by decrying "the insanity *** brought about by street gangs." He later pled for the jury to send a message to the gangs. The prosecutor also listed the wrong choices defendant made, starting with his choice to join a gang. Defendant argues that these remarks deprived him of a fair trial, just as the remarks in *People v. Fluker*, 318 Ill. App. 3d 193 (2000), deprived that defendant of a fair trial. We disagree.

The case for the prosecution in *Fluker* rested on the out-of-court identifications of the defendant as the offender by two eyewitnesses. Both of the witnesses retracted the identifications at trial. The prosecutor, choosing to mislead the jurors, said:

> " 'The only issue in this case is not is this a mistaken identity ***. The only issue is who do you want to control our criminal justice system? ***
>
> * * *
>
> *** Do you want *** the Four Corner Hustlers to control our society?' " *Fluker*, 318 Ill. App. 3d at 203.

The trial court compounded the error by overruling prompt, appropriate objections.

The prosecutor here did not substitute any improper, irrelevant issue for the issue properly before the jury. The comments on gangs here were also less pervasive than the comments in *Fluker*. The comments here resemble the comments in *People v. Morgan*, 306 Ill. App. 3d 616, 632-33 (1999), more closely than the comments in *Fluker*. In *Morgan*, the appellate court held that the trial court cured prejudice from remarks on gangs by sustaining the defendant's prompt objections. We cannot say that the comments on gangs here deprived defendant of a fundamentally fair trial.

Defendant also objects to the prosecutor's comments on the burden

of proof. The prosecutor made light of defense counsel's emphasis on the burden, saying that he would not "cower under [the] table." The prosecutor then attempted to define the burden of proof beyond a reasonable doubt, arguing that the prosecution need not prove guilt beyond all doubt, and that juries across the country find evidence in other cases sufficient to meet the burden. The appellate court has repeatedly held similar arguments improper. See *People v. Jones*, 241 Ill. App. 3d 228, 234 (1993); *People v. Frazier*, 107 Ill. App. 3d 1096, 1102 (1982); *People v. Martinez*, 76 Ill. App. 3d 280, 285 (1979). However, the appellate court has also held that by sustaining objections and properly instructing the jury, the trial court can ameliorate the prejudicial effect of such remarks. *People v. Wielgos*, 220 Ill. App. 3d 812, 820-21 (1991). Again, we cannot say that the improper comments on the burden of proof deprived defendant of a fundamentally fair trial.

Even considering the closing argument as a whole, we cannot say that the comments "were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process." *People v. Albanese*, 104 Ill. 2d 504, 518 (1984). Accordingly, we affirm the conviction for first degree murder.

## III

After the jury found defendant guilty of first degree murder, the trial court, at sentencing, found that defendant committed the murder in an exceptionally brutal and heinous manner indicative of wanton cruelty. Based on that finding, the court sentenced defendant to an extended term of 90 years in prison, pursuant to sections 5—5—3.2 and 5—8—2 of the Unified Code of Corrections. 730 ILCS 5/5—5—3.2(b)(2), 5—8—2(a)(1) (West 1996).

■ The appellate court has repeatedly held that if no jury finds a defendant eligible for the death penalty, the statutory scheme for extended-term sentences denies defendants due process. *E.g., People v. Nitz*, 319 Ill. App. 3d 949, 962-69 (2001). The statute permits the court to sentence a defendant to a term in excess of the maximum permitted by statute for the charge submitted to the jury, based on a finding of fact never submitted for jury determination. *People v. Nitz*, 319 Ill. App. 3d 949, 962-69 (2001); *Swift*, 202 Ill. 2d at 383. As the court explained in *Nitz*:

> "When we examine the machinery for the imposition of a life sentence, we need to ask: What was the most severe punishment the law allowed the trial judge to impose, absent his finding that [the defendant] killed [the victim] in a brutal and heinous manner indicative of wanton cruelty? *** ['D]oes the required finding expose the defendant to a greater punishment than that authorized

by the jury's guilty verdict?' " *People v. Nitz*, 319 Ill. App. 3d at 968, quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494, 147 L. Ed. 2d 435, 457, 120 S. Ct. 2348, 2365 (2000).

Here, as in *Nitz* and *Swift*, the jury's verdict, without any additional finding of fact, authorized the court to sentence defendant to a term of between 20 and 60 years in prison. 730 ILCS 5/5—8—1(a)(1)(a) (West 1996); *Swift*, 202 Ill. 2d at 388. The Unified Code of Corrections unconstitutionally deprived defendant of the right to a jury determination of a fact crucial for setting the range of appropriate sentences the court has the authority to impose.

The extended-term provisions are not facially unconstitutional, because due process permits courts to impose an extended term upon any defendant that a jury finds eligible for the death penalty. *Swift*, 202 Ill. 2d at 392; *People v. Ford*, 198 Ill. 2d 68, 74-75 (2001). But the jury made no such finding here. Therefore, the extended-term sentence violates defendant's right to due process. *Swift*, 202 Ill. 2d at 383.

■ In *Crespo*, 203 Ill. 2d at 349, and *Thurow*, 203 Ill. 2d at 371-72, our supreme court held that similar deprivations of due process did not require reversal under the circumstances of those cases. The decision in *Thurow*, 203 Ill. 2d at 363, 368, requires harmless error analysis of an *Apprendi* issue when trial counsel has raised an appropriate and timely objection. Defendant here does not claim that his counsel anticipated the ruling in *Apprendi*. Therefore, we analyze the issue under the standard for plain errors, as set out in *Crespo*, 203 Ill. 2d at 347-48. We will reverse only if defendant shows that the deprivation of his right to due process prejudiced him. *Crespo*, 203 Ill. 2d at 347-48.

In other circumstances, our supreme court has held that a defendant who shows that errors denied him the right to due process has established prejudice. See *People v. Tenner*, 206 Ill. 2d 381, 393 (2003). Here, every *Apprendi* violation is a denial of the right to due process, so application of that test for prejudice would require a different result in *Crespo*. The court found no need to remand in *Crespo* because it had "no doubt that a jury, presented with [the] facts [of that case], would have found that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty." *Crespo*, 203 Ill. 2d at 348. We do not believe the court intended to establish a new test for prejudice that would require such strong proof to show that the defendant did not suffer prejudice. Instead, we apply a more general test for prejudice.

To show prejudice from an error, a defendant must show a reasonable probability that the result of the proceeding would have been different without the error. *People v. Cloutier*, 178 Ill. 2d 141, 173 (1997).

That is, an error has created prejudice if it "could reasonably have affected the verdict." *People v. Alexander*, 212 Ill. App. 3d 1091, 1105 (1991); see *People v. Truss*, 254 Ill. App. 3d 767, 777 (1993).

A jury must take into account all of the circumstances surrounding an offense in assessing whether the brutality and heinousness of the crime qualify as exceptional. *People v. Grady*, 107 Ill. App. 3d 970, 977 (1982). For this determination courts have emphasized various factors, including:

> "[T]he unprovoked and senseless nature of the attack [citation]; the number of wounds inflicted [citation]; the extent of the injury inflicted [citation]; use of a series of actions to terrorize and endanger the victim [citation]; conduct devoid of mercy or compassion [citation]; the amount of force used, including wholly gratuitous violence [citation]; and the mental anguish of the victim [citation]." *People v. Kennedy*, 336 Ill. App. 3d 425, 432-33 (2002).

The trier of fact must bear in mind that murder is generally brutal and heinous, but the legislature reserved extended-term sentences for murders that are exceptionally brutal and heinous, murders that indicate not merely cruelty but "wanton cruelty." 730 ILCS 5/5—5—3.2(b)(2) (West 1996); see *People v. Andrews*, 132 Ill. 2d 451, 466 (1989).

In this case the prosecution presented evidence, in defendant's statement, that the victim provoked the attack by driving after Arteaga's car and crashing into that car after it turned around. While the jury might not have believed all of defendant's statement, we cannot say on this record that the evidence of provocation was inherently incredible. The prosecution presented no evidence that defendant terrorized the victim or that the victim suffered any mental anguish. While defendant used exceptional force and inflicted multiple wounds, we cannot determine how the jury might have weighed the conflicting factors. Given the brutality and heinousness of murder, we find a reasonable probability that rational jurors could have found the murder here not exceptionally brutal and heinous, or they could have found that the prosecution did not prove that defendant's acts indicated wanton cruelty. That is, we find that defendant suffered prejudice due to the deprivation of his constitutional right to a jury trial on all facts crucial for setting the range of authorized sentences.

Although the record includes some evidence of provocation, we find that the trial court did not abuse its discretion by refusing the second degree murder instruction because the severe beating of the unresponsive victim was disproportionate to the provocation. Although the prosecutors made several improper arguments, defendant failed to object. We cannot say that the improper arguments deprived defendant

of a fundamentally fair trial or that the comments amount to plain error. Following *Nitz* and *Swift,* we find the extended-term sentencing statute unconstitutional as applied to defendant. Because defendant showed a reasonable probability that a jury could have found that the brutality and heinousness of the murder did not qualify as exceptional, he sufficiently showed that the deprivation of due process prejudiced him. Therefore, we vacate the sentence and remand to the circuit court for resentencing.

Affirmed in part and vacated in part; cause remanded.

O'MALLEY, P.J., and SMITH, J., concur.