NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 240392-U

NO. 4-24-0392

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| TAHIR J. GOODMAN SR., | ) | No. 21CF783 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine S. Gorman, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justice Zenoff concurred in the judgment.
Justice Doherty specially concurred.

**ORDER**

¶ 1    *Held*:   (1) Defendant was not entitled to jury instructions on second degree murder and involuntary manslaughter because the record lacked sufficient evidence for a reasonable jury to find in his favor on those defenses.

(2) Because defendant murdered the occupant of a house before setting the house on fire to cover up the murder, defendant was legitimately found guilty of aggravated arson, as distinct from simple arson, even though the person who defendant knew was present—namely, the occupant—was dead.

¶ 2    A Peoria County jury found defendant, Tahir J. Goodman Sr., guilty of first degree murder (see 720 ILCS 5/9-1(a)(1), (2) (West 2020)) and aggravated arson (see *id.* § 20-1.1(a)(1)). The circuit court sentenced him to a total of 59 years' imprisonment. Defendant appeals on two grounds.

¶ 3    First, defendant argues that the circuit court erred by refusing to give jury instructions on the lesser offenses of second degree murder based on provocation (see *id.* § 9-

2(a)(1)) and involuntary manslaughter based on recklessness (*id.* § 9-3(a)). We find, however, no abuse of discretion in the refusal of those proposed instructions.

¶ 4    Second, defendant argues the circuit court erred by denying his motion for a directed verdict on the count of aggravated arson. We disagree because when the evidence is viewed in a light most favorable to the prosecution, a rational trier of fact could find, beyond a reasonable doubt, the elements of aggravated arson.

¶ 5    Therefore, we affirm the circuit court's judgment.

¶ 6                              I. BACKGROUND

¶ 7                              A. The Fire

¶ 8    On December 1, 2021, around 5 or 5:15 a.m., firefighters of the Peoria Fire Department arrived at 1021 East Virginia Street, where a fire was blowing out the windowpanes of the house. The door to the house was locked, so the firefighters had to force their way inside. In a bedroom in the rear left corner of the house, on a mattress that had burned down to the bedsprings, they found the charred body of a woman, who, soon afterward, was identified from tattoos and dental records as J'Naysia Hobbs.

¶ 9    In the opinion of a fire arson investigator, Brad Pierson, the fire started in that bedroom no earlier than 5 a.m. on December 1, 2021. He noted that, in merely five or six minutes, a fire could go from being lit to busting out windowpanes. He concluded that the fuel source or origin of the fire was the bed. Because there was no heat-producing appliance or other potential source of ignition nearby that could have set the bed on fire, Pierson inferred that a human had set the bed on fire, using an open flame, without an accelerant.

¶ 10                             B. The Autopsy

¶ 11   In an autopsy, a forensic pathologist, Amanda Youmans, found that although

there were fourth- and fifth-degree burns on 100% of the surface of Hobbs's body, the internal organs were relatively well-preserved. Youmans saw no soot in the lungs or upper airways and no evidence of carbon monoxide in the blood. She concluded, therefore, that when the fire started, Hobbs was already dead.

¶ 12　　　　Dissection of the neck revealed the cause of Hobbs's death. Youmans found bleeding on both sides of the hyoid bone, the right side of which was fractured. (Youmans testified that if Hobbs had been alive when the fire was started, the fracture of her hyoid bone would not have prevented her from breathing.) Also, the voice box and the epiglottis had pinpoint hemorrhaging from capillaries that had burst under pressure. Youmans concluded, therefore, that Hobbs had died of manual strangulation. Strangling someone to death, Youmans explained, required the application of constant pressure for four to five minutes.

¶ 13　　　　　　　　　　C. The In-Home Security System

¶ 14　　　　Hobbs had an in-home security system, which, despite the fire, still functioned. A video camera was trained on the living room, but in the video for November 30 and December 1, 2021, no person was pictured. Also, the system recorded the times when the front door of the house opened and closed. On December 1, 2021, according to the system, the door opened at 3:18 a.m. and closed at 3:23 a.m., opened at 4:34 a.m. and closed at 4:39 a.m., and opened at 5 a.m. and closed at 5:03 a.m.

¶ 15　　　　　　　　　　D. Hobbs's Ride Home From Work

¶ 16　　　　Crystal Henderson was Hobbs's coworker. She testified that on November 30, 2021, she worked the same shift as Hobbs, from 2 p.m. to 10 p.m., and that when their shift ended, she gave Hobbs a ride home. Hobbs used Henderson's cell phone to call a man—whom the police later determined was defendant—and Henderson heard them arguing about money.

Henderson dropped Hobbs off at her home between 11 p.m. and 11:30 p.m. on November 30, 2021.

¶ 17                    E. Defendant's Interactions With Detective Jason Leigh

¶ 18          Jason Leigh was a Peoria detective assigned to investigate arson-related cases. On December 1, 2021, after the fire, Leigh was at Hobbs's house when someone in the crowd handed him a cell phone and told him that Hobbs's boyfriend, defendant, wanted to talk with him. Leigh—who was not yet sure of the victim's identity—met with defendant at his mother's house, at 1618 Faraday Avenue. Later that morning, at the police station, Leigh spoke with defendant further. Defendant allowed the police to download data from both cell phones that he had on his person.

¶ 19          Around 8 p.m. on December 1, 2021, after finding out for sure that the deceased was Hobbs and learning from Youmans that the cause of death was strangulation, Leigh interviewed defendant again. This time, defendant described a physical altercation in which Hobbs came after him with scissors and he took the scissors away from her. According to defendant, he and Hobbs fell to the floor in their struggle and got back up, and for about 30 minutes, she kept grabbing items and coming after him as he tried to fend her off. He recalled that as they wrestled, she was breathing strangely, but he did not know what happened to her.

¶ 20                            F. GPS Data

¶ 21          GPS data from defendant's cell phone revealed that, from about 11:30 p.m. on November 30, 2021, to about 5 a.m. on December 1, 2021, the phone was near 1021 East Virginia Street. At 5:03 a.m. on December 1, 2021, the phone went east on West Virginia Street, and at 5:21 a.m., the phone wound up on Faraday Avenue.

¶ 22                     G. The Motion for a Directed Verdict

¶ 23    After the State rested, the defense moved for a directed verdict. Defense counsel pointed out that one of the elements of aggravated arson was that when the offender set the structure on fire, "one or more persons [were] present." *Id.* § 20-1.1(a)(1). Defense counsel argued there was a lack of evidence to support that element. The State's own witness, Youmans, had opined that Hobbs was already dead when defendant set the fire. Hence, according to defense counsel, Hobbs was no longer a person at the time of the arson. Nor was there evidence that anyone else was in the house.

¶ 24    Nevertheless, on the authority of *People v. Thomas*, 137 Ill. 2d 500 (1990), the circuit court denied the motion for a directed verdict on count III, the count of aggravated arson. The court denied the motion as to the murder counts, too.

¶ 25                     H. Defendant's Account to the Jury

¶ 26    After the State rested and his motion for a directed verdict was denied, defendant chose to take the stand in his own behalf. He testified essentially as follows.

¶ 27    Hobbs had been his girlfriend for about 45 days before her death. Throughout that time, they had a "very toxic relationship." They argued frequently.

¶ 28    At 12:30 a.m. on December 1, 2021, Hobbs started arguing with defendant because he "had left the keys" and she suspected he was with another woman. Initially, during this argument, which lasted about 30 minutes, defendant did not commit any act of violence against Hobbs, but, rather, the physical aggression was all on her side, and he merely acted defensively. She hit him in the face and head. She threw Christmas ornaments and a plastic vase at him. She grabbed a pair of scissors and tried to attack him, but he took the scissors away from her. She came at him with a taser, but he took that away from her, too. Then, as he began walking away, she jumped onto his back and put him in a chokehold. It was then that his "fear

turned into anger." He flipped her off his back and onto the bed, put both hands around her neck, and choked her for two to three minutes—maybe longer, he granted. But he did not intend to kill her or even to cause her significant physical harm. If he "had it to do over," he "wouldn't proceed the same way."

¶ 29     At times in his testimony, defendant explained his excessive use of force against Hobbs as originating in "fear for [his] life." Hobbs was "acting crazy," and there were "knives on top of the refrigerator"—although, he admitted, the refrigerator was in the kitchen, not in the bedroom, where the altercation took place. On cross-examination, the prosecutor elicited from defendant the further admissions that, at the time of the incident, he had two working cell phones in his pocket and that he could have gone to his mother's house on Faraday Avenue.

¶ 30     At other times in his testimony, defendant attributed his overreaction to anger and being upset. He felt disrespected as Hobbs kept hitting him and "calling out [his] name." He felt as if "she was provoking [him]" by coming at him with scissors and throwing things at him. Because she angered him, he choked her. He was uncertain when it was that she lost consciousness. "After she died, [he] let go of her."

¶ 31     To cover up the murder, defendant then set the fire. He wanted to make it look as if Hobbs had died from the fire instead of from strangulation.

¶ 32          I. The Difference in Size Between Hobbs and Defendant

¶ 33     According to the testimony of Hobbs's mother, Love Hobbs, her daughter was 24 years old at the time of her death, and she was 5 feet tall and weighed 125 pounds.

¶ 34     According to defendant's testimony, he was 5 feet, 10 inches tall and weighed 200 pounds. He admitted he was significantly bigger than Hobbs.

¶ 35          J. Jury Instructions Tendered by Defense Counsel

¶ 36 At the jury instruction conference, defense counsel tendered instructions on second degree murder (see 720 ILCS 5/9-2(a)(1) (West 2020)), involuntary manslaughter (see *id.* § 9-3(a)), serious provocation, and recklessness. Defense counsel argued there was evidence that Hobbs had provoked defendant and that he had recklessly killed her instead of intending to do so.

¶ 37 The circuit court refused those jury instructions. The court explained that although it had "considered intense passion,"

"[t]here is nothing to suggestion [*sic*] that this was anything other than a garden variety argument.

There's no evidence that [defendant] was caught by surprise by a serious provocation. The parties were arguing. It escalated, and [defendant] was able to remove and address any issues as presented by Ms. Hobbs.

And with respect to intense passion, there was nothing to suggest that there were circumstances that caught [defendant] off guard or surprised him and he behaved in a way in a split second, he'd handled the situation, and then it went from bad to worse.

So, I'm going to find that the instructions as it relates to second degree, the facts do not warrant that[.]"

¶ 38 K. The Guilty Verdicts, the Posttrial Ruling, and the Sentences

¶ 39 On September 20, 2023, the jury found defendant guilty of all three counts of the indictment: counts I and II, which charged him with first degree murder (see *id.* § 9-1(a)(1), (2)), and count III, which charged him with aggravated arson (see *id.* § 20-1.1(a)(1)).

¶ 40 On November 16, 2023, defense counsel filed a motion for a new trial. The

motion claimed the circuit court had erred by denying the motion for a directed verdict and "refusing to give Defendant's tendered instructions."

¶ 41        At a hearing that same day, the circuit court denied the motion for a new trial and held a sentencing hearing, at the conclusion of which the court imposed a prison term of 53 years for first degree murder and a consecutive prison term of 6 years for aggravated arson.

¶ 42        On December 7, 2023, defense counsel filed a motion for reconsideration of the sentences.

¶ 43        On February 29, 2024, at a postsentencing hearing, the circuit court declined to reduce the sentences.

¶ 44        That same day, the circuit clerk filed a notice of appeal on defendant's behalf. According to this notice of appeal, the date of judgment or order from which defendant appealed was February 29, 2024.

¶ 45        On March 15, 2024, the Office of the State appellate Defender filed an amended notice of appeal, which described the "Nature of Order Appealed" as "Conviction, Sentence, and Denial of Motion to Reconsider Sentence."

¶ 46                        II. ANALYSIS

¶ 47                A. The Refusal of Defendant's Jury Instructions

¶ 48                        1. *Second Degree Murder*

¶ 49                a. A Grossly Disproportionate Response to the Provocation

¶ 50        To commit first degree murder as charged in the indictment, defendant had to "intend[ ] to kill or do great bodily harm to [Hobbs], or know[ ] that [his acts would] cause [her] death." *Id.* § 9-1(a)(1). Alternatively, he had to "know[ ] that such acts create[d] a strong probability of death or great bodily harm to [Hobbs]." *Id.* § 9-1(a)(2). The nonextended term of

- 8 -

imprisonment for first degree murder is "not less than 20 years and not more than 60 years." 730 ILCS 5/5-4.5-20(a) (West 2020).

¶ 51    There is a less serious form of homicide, second degree murder (see *id.* § 9-2), which is a Class 1 felony (see § 9-2(d)) punishable by imprisonment for not less than 4 years and not more than 15 years (see 730 ILCS 5/5-4.5-30(a) (West 2020)). See *People v. Wilmington*, 2013 IL 112938, ¶ 48 ("Second degree murder is not a lesser-included offense of first degree murder; rather, it is more accurately described as a *lesser-mitigated offense* of first degree murder." (Emphasis in original.)). Subsections (a) and (b) of section 9-2 of the Criminal Code of 2012 (Code) define second degree murder as follows:

"(a) A person commits the offense of second degree murder when he or she commits the offense of first degree murder as defined in paragraph (1) or (2) of subsection (a) of Section 9-1 of this Code [(720 ILCS 5/9-1(a)(1), (2) (West 2020))] and either of the following mitigating factors are present:

(1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed; or

(2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code [(*id.* art. 7)], but his or her belief is unreasonable.

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person[.]" 720 ILCS 5/9-2(a), (b) (West 2020).

¶ 52 One of the defenses that defendant wished to have incorporated into the jury instructions was that, instead of committing first degree murder (see *id.* § 9-1(a)(1), (2)), he committed second degree murder within the meaning of section 9-2(a)(1) of the Code (see *id.* § 9-2(a)(1)). He wanted his defense of provocation to be explained to the jury so that the jury would be equipped to consider that defense. To quote Robert S. Hunter:

> "[P]rovocation is, in a sense, a defense to the crime of murder, but it is not a defense that, even though successfully asserted, will result in a finding of not guilty as to any crime. When provocation is raised, the defendant is entitled to have IPI—Criminal No. 7.03 given to the jury." Robert S. Hunter & Mark A. Schuering, Trial Handbook for Illinois Lawyers—Homicide § 9:1 (2d ed.).

That is to say, when there is evidence of provocation, a defendant is entitled to have Illinois Pattern Jury Instructions, Criminal, No. 7.03 (4th ed. 2000), given to the jury: an instruction explaining how the "mitigating factor" of "[s]erious provocation" can "reduce the offense of first degree murder to the lesser offense of second degree murder." The rights to due process (see U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2) and a jury trial (see U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8) encompass "the right to have a jury fully and properly instructed on the law, including the law applicable to the defendant's theory of the case." *People v. Taylor*, 2023 IL App (4th) 220381, ¶ 56. "Although jury instructions are left to the trial court's discretion, the court abuses its discretion if there is some evidence to support the instruction and the court fails to give it." *People v. Klimawicze*, 352 Ill. App. 3d 13, 30 (2004).

¶ 53 A defendant does not have the right to jury instructions that lack a basis in the evidence. See *People v. Everette*, 141 Ill. 2d 147, 157 (1990). But the evidence supporting the proposed instructions need not be abundant. The supreme court has held that "very slight

evidence upon a given theory of the case will justify the giving of an instruction." (Internal quotation marks omitted.) *People v. Bratcher*, 63 Ill. 2d 534, 539 (1976). The question is how much evidence is required to satisfy this standard of minimality. Is "very slight evidence" that which goes only part of the way toward establishing the defense? Or must there be a little evidence on each element of the defense? How should the "minimal level" of evidence be described? *Id.*

¶ 54 A description may be found in *Everette*. In that case, the supreme court quoted the following standard from *Mathews v. United States*, 485 U.S. 58 (1988): " '[A]s a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor[.]' " *Everette*, 141 Ill. 2d at 156 (quoting *Mathews*, 485 U.S. at 64). See *People v. Handley*, 51 Ill. 2d 229, 236 (1972) ("In refusing to give the tendered manslaughter instructions, the trial court determined that there was no evidence in the record from which the jury could have found the defendants guilty of manslaughter. We concur in that determination."). The appellate court has repeatedly applied the *Mathews* standard. See *People v. Jones*, 2024 IL App (1st) 221555, ¶ 54 ("[A] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." (Internal quotation marks omitted.)); *People v. Grabow*, 2022 IL App (2d) 210151, ¶ 20 (same); *People v. Kratovil*, 351 Ill. App. 3d 1023, 1035 (2004) (same).

¶ 55 Very slight evidence, then, is evidence that is barely adequate for a reasonable jury to find in the defendant's favor on the defense. See *Everette*, 141 Ill. 2d at 156; *Jones*, 2024 IL App (1st) 221555, ¶ 54; *Grabow*, 2022 IL App (2d) 210151, ¶ 20; *Kratovil*, 351 Ill. App. 3d at 1035. "A reasonable jury" does not mean *every* reasonable jury. If reasonable minds could differ

on whether the evidence supports the defense, refusing the jury instruction would be an abuse of discretion. Resolving uncertainty in the defendant's favor is implied in the phrase "some evidence." *Klimawicze*, 352 Ill. App. 3d at 30. "[T]he court abuses its discretion if there is *some evidence* to support the instruction and the court fails to give it"—not evidence that every reasonable mind would find to be convincing, but some evidence that might be considered rationally convincing. (Emphasis added.) *Id.*

¶ 56 The question for us, therefore, is whether it would have been within the range of reasonableness to find defendant guilty of second degree murder (see 720 ILCS 5/9-2(a)(1) (West 2020)) instead of first degree murder (see *id.* § 9-1(a)(1), (2)). Defendant contends that the answer is yes because he suffered, at the hands of Hobbs, a "substantial physical *** assault" (*People v. Powell*, 2013 IL App (1st) 111654, ¶ 36) that would have "excited an intense passion in a reasonable person" (720 ILCS 5/9-2(b) (West 2020)). In that regard, he compares himself to the defendants in *People v. Harris*, 8 Ill. 2d 431 (1956), *People v. Dortch*, 20 Ill. App. 3d 911 (1974), and *People v. Stowers*, 133 Ill. App. 2d 627 (1971).

¶ 57 As the State points out, however, the comparison is problematic because the defendants in those three cases suffered a physical injury or assault that was considerably more substantial than anything Hobbs did to defendant (judging by his testimony).

¶ 58 In *Harris*, a bouncer beat the defendant so brutally with a nightstick that the defendant "did not know where he was or who assisted him from the tavern." *Harris*, 8 Ill. 2d at 435. Within 15 minutes after this assault (according to the defendant's account), the defendant returned to the tavern and fatally shot the bouncer "without realizing that he had even pulled the trigger." *Id.* The head trauma that the defendant suffered was so severe that, for two weeks, he was unable to "chew solid food" and "both the jail warden and physician suspected a possible

- 12 -

fracture of the jaw and cheek bones." *Id.*

¶ 59 Similarly, in *Stowers*, the defendant was beaten almost senseless before he allegedly fired the fatal shot. According to the defendant's testimony in that case, the deceased "hit him in the forehead with a can of beer," and the defendant "fell down and remembered nothing that happened thereafter." *Stowers*, 133 Ill. App. 2d at 631. The wound on the defendant's forehead "required stitches." *Id.*

¶ 60 Although the defendant in *Dortch* suffered no physical injury, multiple people, armed with knives and a bottle, were closing in on him when he shot one of the knife-wielders, Lerdie L. Dortch, just as she took hold of him. *Dortch*, 20 Ill. App. 3d at 913. Dortch was 6 feet, 5 inches tall and weighed 230 or 240 pounds, compared to the defendant, who was 5 feet, 7 inches tall and weighed 180 pounds. *Id.* Thus, the defendant was outweighed and outnumbered. The appellate court held that "an assault by several persons armed with knives is provocation which will reduce an intentional killing from murder to voluntary manslaughter" (*id.* at 914)—an offense now known as second degree murder (Robert S. Hunter & Mark A. Schuering, Trial Handbook for Illinois Lawyers—Homicide § 9:1 (2d ed.)).

¶ 61 Defendant testified that Hobbs came after him with scissors and a taser. It does not appear from defendant's testimony, however, that these assaults "excite[d] an irresistible passion in" him. *Harris*, 8 Ill. 2d at 434-35. Instead, after taking the scissors and taser from Hobbs, he demonstrated mastery of his emotions by turning his back and beginning to walk away. It was only when Hobbs jumped on his back and put him in a chokehold, as he was walking away, that he became enraged. It was only then that, as he put it, his "fear turned into anger."

¶ 62        Arguably, being jumped on and placed in a chokehold is "serious[ly] provo[king]," even if the assailant is smaller than oneself. 720 ILCS 5/9-2(b) (West 2020). A "reasonable person" subjected to such an assault would normally react with "intense passion." *Id.* A reasonable person would not characterize it as a *trivial* provocation.

¶ 63        Even though sudden passion is justified, a gross overreaction can invalidate the defense of provocation by taking the defendant out of the category of hot-blooded passion and into the category of cold-blooded malice. See 1 Crim. L. Def. § 102 (June 2024 update) ("Provocation is commonly said to negate the 'malice' required for murder.").

> "No matter how intense the passion on the part of the slayer, he will not be relieved of liability for murder unless the passion is engendered by a serious provocation which the law recognizes as being reasonably adequate. [Citation.] Further, the provocation must be proportionate to the manner in which the accused retaliates[.]" *People v. Siverly*, 194 Ill. App. 3d 981, 987-88 (1990).

Every second degree murder based on provocation could be regarded as an overreaction. Nevertheless, a killing can be, under the circumstances, *so* disproportionate to the provocation that the provocation cannot serve as a mitigating factor (see *Klimawicze*, 352 Ill. App. 3d at 31; *People v. Mena*, 345 Ill. App. 3d 418, 424 (2003); *People v. Dowdell*, 84 Ill. App. 3d 707, 710 (1980)).

¶ 64        Because of the disparity in their sizes, the retaliation that defendant inflicted upon Hobbs was grossly disproportionate to her provocation of him. She was 5 feet tall and weighed 125 pounds, whereas he was 5 feet, 10 inches tall and weighed 200 pounds.

¶ 65        To repeat, sudden, intense passion would have been a reasonable reaction to being jumped on and placed in a chokehold—even if the assailant were a smaller adult. See 720 ILCS

5/9-2(b) (West 2020). Even so, for the intensity of the passion to remain unabated even after defendant flipped Hobbs onto the bed and choked her into unconsciousness was unreasonable, especially considering their difference in size. Before defendant accomplished the death of Hobbs, there was a "sufficient cooling off period for the voice of reason to return." *Stowers*, 133 Ill. App. 2d at 632. Choking the life out of someone is more time-consuming than pulling a trigger.

¶ 66    "What constitutes a sufficient 'cooling-off period' depends upon the extent to which the passions have been aroused and the nature of the act which caused the provocation[.]" (Internal quotation marks omitted.) *Id.* The nature of the act that caused the provocation in the present case is hardly comparable to the nature of the acts that caused the provocations in *Harris*, *Stowers*, and *Dortch*. Hobbs inflicted no serious injury upon defendant and posed no great danger to him. Unlike the defendants in *Harris* and *Stowers*, defendant did not suffer great physical harm, and unlike the defendant in *Dortch*, he was not subjected to a life-threatening assault. Defendant described no difficulty in taking the scissors and taser from Hobbs and in flipping her off his back. What the physically large defendant did to the physically small Hobbs—placing both his hands around her neck as she lay helplessly on the bed, applying enough force to fracture her hyoid bone, and maintaining that pressure for four to five minutes— was so disproportionate to her provocation of him that no reasonable jury would find him guilty of second degree murder. See *Everette*, 141 Ill. 2d at 156; *Handley*, 51 Ill. 2d at 236; *Jones*, 2024 IL App (1st) 221555, ¶ 54; *Grabow*, 2022 IL App (2d) 210151, ¶ 20; *Kratovil*, 351 Ill. App. 3d at 1035. Therefore, we find no abuse of discretion in the refusal of defendant's proposed jury instructions on the mitigating factor of provocation. See *People v. McDonald*, 2016 IL 118882, ¶ 42 ("We hold that when the trial court, after reviewing all the evidence, determines that there is

- 15 -

insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion.").

¶ 67                           b. Negligence and Accident

¶ 68        To have found defendant guilty of second degree murder, the jury would have had to find that he "negligently or accidentally caused the death of" Hobbs. 720 ILCS 5/9-2(a)(1) (West 2020). We acknowledge defendant's testimony that he did not try to kill Hobbs, that he did not expect her to die, and that he did not think that anything he was doing would cause significant harm to her. A defendant, however, is not entitled to "unlimited [jury] instructions *** based upon the merest factual reference or witness's comment." *Bratcher*, 63 Ill. 2d at 539-40.

¶ 69        Despite his comments that he lacked an intent to kill or significantly harm Hobbs, defendant did not negligently or accidentally place his hands around her neck. He did not negligently or accidentally continue to choke her after she stopped moving. He did not negligently or accidentally maintain the pressure on her neck for four or five minutes, until she died. The way that defendant killed Hobbs required persistence. No reasonable jury would find that his killing of her was negligent or accidental. See *Everette*, 141 Ill. 2d at 156; *Handley*, 51 Ill. 2d at 236; *Jones*, 2024 IL App (1st) 221555, ¶ 54; *Grabow*, 2022 IL App (2d) 210151, ¶ 20; *Kratovil*, 351 Ill. App. 3d at 1035. For this additional reason, the rejection of defendant's proposed jury instructions on second degree murder was not an abuse of discretion. See *McDonald*, 2016 IL 118882, ¶ 42.

¶ 70                           2. *Involuntary Manslaughter*

¶ 71        Defendant maintains that the circuit court erred by refusing his proposed jury instructions on involuntary manslaughter, as presently defined (see 720 ILCS 5/9-3(a) (West

2020)). Under section 9-3(a) of the Code, "[a] person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly[.]" *Id.* Involuntary manslaughter is a lesser offense that is included in first degree murder. *People v. Robinson*, 232 Ill. 2d 98, 105 (2008). The supreme court has explained:

> "The basic difference between involuntary manslaughter and murder is the mental state which accompanies the conduct causing the homicide. To sustain a conviction for murder, there must be sufficient evidence by which it is shown that the accused either intended to kill or knew of the strong probability of death or great bodily harm. (Ill. Rev. Stat. 1985, ch. 38, par. 9-1.) Involuntary manslaughter is defined as the killing of a human being by actions which 'are likely to cause death or great bodily harm *** and [are] perform[ed] recklessly.' (Ill. Rev. Stat. 1985, ch. 38, par. 9-3(a).) A person acts recklessly when he 'consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.' Ill. Rev. Stat. 1985, ch. 38, par.4-6." *People v. Foster*, 119 Ill. 2d 69, 87-88 (1987).

¶ 72        If there is some evidence that, if believed by the jury, would reduce the crime to involuntary manslaughter, the defendant, charged with first degree murder, is entitled to have an instruction given on involuntary manslaughter. *People v. Austin*, 207 Ill. App. 3d 896, 899 (1990). Assume, for example, that, in an altercation, the defendant pulled a pistol on the victim,

the victim grabbed the pistol, and when the defendant jerked the pistol back, it went off, killing the victim, even though the defendant was unaware of pulling the trigger. See *id.* Those were the facts in *Austin* as the defendant in that case related them. If the jury believed that account, it could reasonably find that the defendant "unintentionally caused the death of the decedent by acts which were performed recklessly and likely to cause death or great bodily harm." *Id.* Therefore, the defendant would be entitled to a jury instruction on involuntary manslaughter. *Id.*

¶ 73 Assume, by contrast, that the only evidence of involuntary manslaughter is the defendant's assertion, at trial, that he or she did not mean to kill the victim. Assume, further, that the defendant makes that assertion in the teeth of clear evidence that the defendant "committed a voluntary and willful act which ha[d] the natural tendency to cause death or great bodily harm." *People v. Terrell*, 132 Ill. 2d 178, 204 (1989). Such were the facts in *People v. Ward*, 101 Ill. 2d 443 (1984), in which the defendant beat to death a child. Noting the "great disparity in size and strength between the defendant and the victim," the supreme court said in *Ward*, "Even if one would assume, *arguendo*, that the defendant's statement that he 'didn't mean to' kill [the victim] was to be considered evidence that he acted recklessly, we judge that the severity of the beating negates any suggestion that his conduct was only reckless." *Id.* at 451-52. Consequently, "[t]he record [did] not permit the conclusion that the trial court's refusal to give an involuntary manslaughter instruction was error." *Id.* at 453.

¶ 74 A case comparable to *Ward* is *People v. Brackett*, 117 Ill. 2d 170, 179 (1987), in which a 21-year-old, 170-pound man beat an 85-year-old woman with enough force to break her bones. The defendant argued "he could not know that blows from his bare fists created a strong probability of death or great bodily harm, as charged under section 9-1(a)(2)." *Id.* at 180. In short, he claimed he did not mean to kill her. The supreme court responded:

"[D]eath may be the natural consequence of blows with bare fists where there is great disparity in size and strength between the two parties. Given the disparity in size and strength between the defendant and [the victim], we find it difficult to give credibility to this argument that the defendant, who battered this victim with enough force to break bones, did not know that his acts created a strong probability of death or great bodily harm." *Id.*

¶ 75    Likewise, when we consider (1) the disparity in size between defendant and Hobbs, (2) his willful act of grabbing her around the neck with his hands and crushing her throat with enough force to break her hyoid bone, and (3) his maintenance of that force for the time required to kill her, we conclude that no reasonable jury would accept defendant's assertion that he was unaware his acts created a strong probability of death or great bodily harm. "The defendant is presumed to intend the natural and probable consequences of his acts, and evidence that the defendant committed a voluntary and willful act which has the natural tendency to cause death or great bodily harm is sufficient to prove the intent required for the offense of murder." *Terrell*, 132 Ill. 2d at 204. "[A] manslaughter instruction should not be given where," as in this case, "the evidence shows that the homicide was murder, not manslaughter." *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 85. Accordingly, we find no abuse of discretion in the refusal of the proposed jury instructions on involuntary manslaughter. See *McDonald*, 2016 IL 118882, ¶ 42.

¶ 76        B. The Denial of the Motion for a Directed Verdict on Count III

¶ 77        "A person commits aggravated arson when in the course of committing arson he or she knowingly damages *** any building *** and *** he knows or reasonably should know that one or more persons are present therein." 720 ILCS 5/20-1.1(a)(1) (West 2020).

¶ 78       Defendant moved for a directed verdict on count III, the count of aggravated arson, because (1) according to the State's evidence, Hobbs was already dead when defendant set her house on fire and (2) a corpse does not qualify as a "person[ ]." *Id.* On the authority of *Thomas*, the circuit court denied the motion for a directed verdict on count III. Defendant contends that the court thereby erred.

¶ 79       "A directed verdict *** is appropriate when a trial court concludes, after viewing all of the evidence in a light most favorable to the State, that no reasonable juror could find that the State had met its burden of proving the defendant guilty beyond a reasonable doubt." *People v. Shakirov*, 2017 IL App (4th) 140578, ¶ 81. To prove defendant guilty of aggravated arson, did the State have to prove that Hobbs was alive when he set her house on fire? Under *Thomas*, the answer is no.

¶ 80       In *Thomas*, Sophie Dudek was in the business of selling perfume, a large quantity of which she stored in her garage. *Thomas*, 137 Ill. 2d at 512. The defendant, the leader of a cleaning crew that was working at Dudek's building, entered the garage and opened a bottle of perfume that he intended to steal. *Id.* The bottle fell on the floor, and at that moment Dudek entered the garage. *Id.* The defendant tried to flee, but she grabbed him by the back of his sweatshirt and screamed. *Id.* The defendant drew a knife and stabbed her, severing her spinal cord and "killing her instantly." *Id.* at 512-13. Then he poured perfume throughout the garage and on Dudek's body and set the perfume on fire, hoping to conceal the murder. *Id.* A jury found the defendant guilty of not only murder and burglary, but also aggravated arson. *Id.* at 511.

¶ 81       On appeal, the defendant complained that irrelevant evidence was admitted at his trial. *Id.* at 521. Over his objection, the circuit court allowed the State to present evidence that an elderly couple, the Smialeks, lived in a unit within the structure that the defendant had set on fire

(*id.*) and that the Smialeks were present at the time of the fire (*id.* at 523). The State also presented evidence that the "defendant had been to the building before and knew that it was home to several people." *Id.* The indictment, however, said nothing about the presence of the Smialeks or of anyone other than Dudek. The indictment alleged simply that the defendant knew that Dudek was present, not that he knew or should have known that anyone else was present. See *id.* at 521.

¶ 82       Nonetheless, according to the supreme court, the indictment adequately informed the defendant that he was charged with aggravated arson, the elements of which could be read in the statute. *Id.* at 523. "The identity of the person known to be in the garage [was] not a material element of the offense and the allegation [might] be considered surplusage." *Id.* at 522. Thus, "the evidence to which [the] defendant objected was properly admitted as being relevant to the aggravated arson charge." *Id.* at 523.

¶ 83       In *Thomas*, though, the defendant's challenge to his conviction of aggravated arson went deeper than his objection of irrelevancy. He argued, as defendant argues in the present case, that "one cannot commit aggravated arson if the person who the State allege[d] the defendant knew was present was in fact dead at the time he committed the arson." *Id.* at 532. In other words, the defendant's reasoning in *Thomas* was this: "[T]he State charged him only with committing arson knowing that Sophie Dudek was present and, because the evidence established that Ms. Dudek was dead at the time [the] defendant started the fire, his conviction cannot stand because the statute only applies when a living person is present." *Id.* at 531.

¶ 84       For essentially three reasons, the supreme court rejected that reasoning. First, the Smialeks were alive, and arguably, the defendant should have known they were present in the building. *Id.* Second, the provision of the aggravated arson statute under which the defendant

was charged was "designed to escalate the punishment *** when the defendant commit[ted] arson with the knowledge that someone [was] likely to get hurt or killed." *Id.* at 532. Although Dudek "probably" was dead when the defendant set the fire, "there [was] no indication that [the] defendant knew she was dead when he set [the] fire." *Id.* Third, the supreme court held:

> "[The] [d]efendant's guilt of aggravated arson should not depend upon the happenstance of whether the decedent expired before or after the defendant struck the match. Dudek's death and the arson were both part of a closely related criminal episode. Whether she died shortly before or shortly after the fire was ignited is not material to the fulfillment of the purpose of the statute." *Id.* at 533.

¶ 85        Under this ongoing criminal episode rule (let us call it), "a dead person" can "have presence in the legal sense." *People v. Carreon*, 225 Ill. App. 3d 133, 147 (1992). For example, in *People v. Gomez*, 2011 IL App (1st) 092185, ¶ 80, the defendant pushed the victim down, stabbed her in the neck with a knife, and sexually assaulted her. In the prosecution for aggravated criminal sexual assault, "[t]he State was not required to prove that [the victim] was still alive when the actual penetration occurred 'essentially simultaneously' as the homicide and as part of the 'same criminal episode.' " *Id.*

¶ 86        To take another example, a person cannot escape an armed robbery conviction by shooting the victim dead before emptying the victim's pockets. See *Carreon*, 225 Ill. App. 3d at 147. As the appellate court reasoned in *Carreon*:

> "The purposes of the robbery and armed robbery statutes are not advanced by a construction which may encourage a robber to murder his or her victims first. Thus, the State did not fail to prove that property was taken from the 'person' or 'presence' of the victim in this case." *Id.*

¶ 87        Likewise, the purposes of the aggravated arson statute would not be advanced by giving the arsonist an incentive to murder the occupant of the building before setting it on fire. Under defendant's interpretation, if *A* murdered the occupant of a house and then set the house on fire to cover up the murder, *A* would be guilty of murder and simple arson, not aggravated arson. But if *B* set the house on fire and the occupant died in the fire, *B* would be guilty of murder and aggravated arson, even though *B* was less culpable than *A* in that *B* at least gave the occupant a chance to get out of the burning house. "It is an elementary principle of statutory interpretation that no statute should be construed in a manner which will lead to consequences which are absurd, inconvenient, or unjust." *People v. Partee*, 125 Ill. 2d 24, 30-31 (1988). *Thomas* forecloses the absurdity of punishing *A* more leniently than *B*.

¶ 88        Defendant warns, however, that if a corpse counts as a "person" in the aggravated arson statute, an "absurd result" will be "created" "in which the burning of a clearly uninhabited mortuary would constitute aggravated arson because of the deceased present therein." However, this hypothetical rests on a misunderstanding of the ongoing criminal episode rule. The "deceased present therein" would not count as persons unless the offender murdered them and, in an ongoing criminal episode, burned the mortuary.

¶ 89        In *Thomas*, there was no evidence that when the defendant set fire to the garage, he knew that Dudek was already dead. See *Thomas*, 137 Ill. 2d at 532. Defendant maintains that *Thomas* is distinguishable not only for that reason, but for the additional reason that, in *Thomas*, the defendant knew or should have known of the presence of some living persons, the Smialeks. See *id.* at 531. In the present case, by contrast, defendant testified he let go of Hobbs's neck when he perceived she was dead. Also, there was no evidence that anyone else was in the house.

¶ 90       We acknowledge those factual distinctions between *Thomas* and this case. We

further acknowledge that, in *Thomas*, when upholding the conviction of aggravated arson, the

supreme court discussed the presence of the Smialeks (see *id.*) and the lack of evidence that the

defendant knew that Dudek was dead when he set the garage on fire (see *id.* at 532).

Nevertheless, the supreme court discussed a third reason for upholding the conviction—the

ongoing criminal episode rule (see *id.* at 532-33)—and this third reason was logically

freestanding, having nothing to do with the previous two reasons.

¶ 91       Besides, it would be difficult to get around this language in *Thomas*: "We are also

unpersuaded by [the] defendant's contention that one cannot commit aggravated arson if the

person who the State alleges the defendant knew was present was in fact dead at the time he

committed the arson." *Id.* at 532. If the supreme court was unpersuaded by that contention, so

should we be unpersuaded.

¶ 92                            III. CONCLUSION

¶ 93       For the foregoing reasons, we affirm the circuit court's judgment.

¶ 94       Affirmed.

¶ 95       JUSTICE DOHERTY, specially concurring:

¶ 96       I concur in the majority's analysis and its disposition of the case. I write

separately to address the question of whether defendant may be convicted of aggravated arson

(720 ILCS 5/20-1.1(a)(1) (West 2020)) even where the evidence shows that the "person"

involved was deceased before the fire was set.

¶ 97       The living and the dead may both be protected against the criminal acts of others,

but they are normally treated much differently under the law. For example, only a living person

can be murdered. See *People v. Caldwell*, 295 Ill. App. 3d 172, 180 (1998) ("An accused is not

criminally responsible for the death of another unless his actions are the cause of the death.").

The bodies of the deceased may still receive some protection of the law, but it is under provisions which specifically address offenses against dead bodies. See, *e.g.*, 720 ILCS 5/12-20.6 (West 2020) (providing criminal penalties for the abuse of a corpse).

¶ 98　　　　Here, the aggravated arson statute provides that the defendant must know, or should know, "that one or more *persons* are present" in the structure set ablaze in order to be criminally liable under the applicable provision. (Emphasis added.) *Id.* § 20-1.1(a)(1). The normal legal distinctions between living victims and the deceased might lead one to conclude that when the statute refers to "persons," it is not referring to the bodies of the deceased. Courts normally will not, under the guise of statutory construction, supply omissions, annex new provisions, or otherwise change a statute to depart from the plain meaning of the language it employs. *People v. Grant*, 2022 IL 126824, ¶ 25. Furthermore, to the extent the word "persons" in the statute is ambiguous, the rule of lenity suggests that the statute would normally be interpreted in the defendant's favor. *People v. Gutman*, 2011 IL 110338, ¶ 12.

¶ 99　　　　Regardless, I agree with the majority that *Thomas*, 137 Ill. 2d at 533, establishes that liability may still exist where the victim's "death and the arson were both part of a closely related criminal episode," and that whether the victim "died shortly before or shortly after the fire was ignited is not material to the fulfillment of the purpose of the statute." When the supreme court "makes a pronouncement as to the proper interpretation of an Illinois statute," this court is bound by such pronouncement. *People v. Washington*, 2023 IL 127952, ¶ 49. Here, we are obligated to follow the rule laid out in *Thomas* unless and until the supreme court departs from its interpretation of the relevant statute.